**CAMERON IRON WORKS, INC.,**
**Plaintiff,**

v.

**EDWARD VALVES, INC., et al.,**
**Defendants.**

**No. 10701.**

United States District Court
S. D. Texas,
Houston Division.
July 30, 1959.

424

Browning, Simms, Hyer & Eickenroht, James B. Simms, Houston, Tex., for plaintiff.

Baker, Botts, Andrews & Shepherd, Garrett R. Tucker, Jr., and Frank B. Pugsley, Houston, Tex., and Strauch, Nolan & Neale, William A. Strauch, John R. Bronaugh, and John D. Nies, Washington, D. C., for defendants.

INGRAHAM, District Judge.

This is a suit for patent infringement, injunction and accounting for profits and damages, brought by Cameron Iron Works, Inc., as plaintiff, against Edward Valves, Inc. and Rockwell Manufacturing Company, defendants. Other defendants were originally named in the Complaint but were dropped as parties by stipulation of counsel. Defendant Edward Valves, Inc., is a subsidiary of defendant Rockwell Manufacturing Company. Mr. Crawford, President of Edward Valves, Inc., is also Vice President of Rockwell Manufacturing Company and serves as Director upon the board of each company.

The patent in suit is patent No. 2,606,-740 issued to plaintiff on August 12, 1952, upon an application of Herbert Allen filed April 5, 1945. The Allen patent is for a "Valve" and relates to an improvement in valves for controlling the flow of abrasive-laden fluids under pressures of as high as several thousand pounds per square inch in various oil and gas well drilling operations. The invention is directed to the form of the sealing means adapted to seal against the closure member of the valve and the valve body when the valve is closed. The principal object of the invention was to provide a valve having a fluid pressure actuated sealing means which will not tend to tear off or be blown past the valve closure member while the gate is being opened or closed.

The Complaint alleges that the defendants have infringed and will continue to infringe the Allen patent by its manufacture, use and sale of valves known as "Mudwonder" valves. The particular claims alleged to be infringed are not specified in the Complaint, but at the trial plaintiff urged only claims 1, 2, 4 and 5. However, defendants attacked the validity of claim 3 as well as claims 1, 2, 4 and 5.

The Allen patent drawings illustrate two gate valves and a plug valve. However, inasmuch as the accused "Mudwonder" valve is a gate valve, most of the evidence and this discussion are limited to gate valves. The gate valve embodies the following elements: A conventional housing having a flow passage therethrough which connects the pipes leading to and from the valve; a chamber intersecting the flow passage in which is located the movable valve closure member called a gate; the gate which is mounted to move up and down in the chamber to shut off the flow when the gate is across the flow passage; and a sealing element to prevent leakage flow around the gate when it is in closed position. In operation when the gate is across the flow passage, the valve is closed and to open the valve the gate is raised to a position not obstructing the flow passage.

The claims recite a novel combination of elements which includes sealing elements having a lip to seal against the gate to stop leakage. The arrangement specified in the claims is such that the

lips are adapted when they are on the downstream side of the closure member to be forced by upstream pressure into sealing engagement with the closure member. The lips have surfaces which are exposed to the upstream pressure in the chamber so as to effect this pressure actuation.

Although the valve is capable of use with either end as the inlet, the seal is always effected against the valve closure member *only* around the valve outlet; that is, on the downstream side of the valve. This is due to the fact that the lip seal is so disposed that the upstream pressure is permitted to pass into the valve chamber and the downstream lip serves to seal the pressure fluid against flowing out of the valve chamber.

From the plaintiff's evidence it appears that this invention was made in an effort to provide a valve that would be easier to open and close than plaintiff's highly successful "Flex-Seal" valve, made under its patent 2,194,262 which is not in suit but is urged as prior art by defendants. Another point of improvement was to provide a valve that did not depend for its sealing action upon how hard the handwheel was turned to close the valve. In other words, a valve that has seals which are actuated by the pressure sealed against.

Mr. Allen testified, when called by the defendants, that the experimental valves made by plaintiff, although they proved the seal principles, did not offer enough practical advantage over the "Flex-Seal" to warrant its adoption over the "Flex-Seal" as a commercial valve. Plaintiff offered evidence showing the construction and successful testing of three plug valves and one gate valve. There is, however, no evidence that the valve was ever made and sold as a commercial item by plaintiff.

The development of the "Mudwonder" valve by defendants and the events leading up to its sale as a commercial valve are shown by a number of the technical reports taken from defendants' own files. These show that as early as 1949 defendants were weighing arguments in favor of copying the Cameron "Flex-Seal" valve against arguments against this procedure. Defendants tested the Cameron "Flex-Seal" valve and compared it to other valves on the market and proceeded to design and construct an experimental valve having a rubber seat in a one-piece body and a gate with a shoulder which would squeeze against the rubber seat and cause an upstream seal much on the principle of the Cameron "Flex-Seal" valve. However, this was abandoned in favor of the "Mudwonder" construction charged as an infringement here.

The "Mudwonder" valve has fluid pressure actuated sealing means which do not tend to tear off or be blown past the valve closure member while the gate is being opened or closed. It is a gate valve that embodies the following elements: A conventional housing having a flow passage therethrough which connects the pipes leading to and from the valve; a chamber intersecting the flow passage in which the movable valve closure member or gate is located; the gate which is mounted to move up and down in the chamber to shut off the flow when the gate is across the flow passage; and a sealing element that prevents leakage flow around the gate when it is in closed position. In operation when the gate is across the flow passage, the valve is closed and to open the valve the gate is raised to a position not obstructing the flow passage.

Plaintiffs evidence shows that defendants' employees in their conversation, in their technical reports, and even in preparing their application for patent, when referring to the "Mudwonder" called the sealing elements of the valve "lips". The lips included the ridge portion of the seal rings that engage the gate and the ridge portion which seal against the body. The seal is provided by the lips on the downstream side of the closure member, which are forced by the upstream pressure in the chamber into sealing engagement with the closure member. The seal is always about the outlet and the upstream pressure leaks by the lips on the upstream side of the gate to pass into the valve chamber.

The lips that confront the gate engage it. At their lower ends these latter lips are joined by a crescent shaped bridge that makes it easier to install the seal ring insert and provides a seal against the very bottom of the gate. The bridge does not change the function of the lips that seal three fourths of the way around the passage.

The evidence shows that defendants received a copy of the Allen patent on August 27, 1952; that in November of 1952 the Allen patent was tested by defendants; and in March of 1953 defendants were advised by their attorneys that Cameron was almost certain to bring this infringement suit. Defendants elected to go ahead with the project and to rely upon prior art, so that the infringement was both bold and deliberate.

Defendants pleaded defenses of anticipation by the prior art, lack of invention over the prior art, non-infringement, file wrapper estoppel, patent and claims are indefinite, misuse of patent and fraudulent misrepresentations to the Patent Office. The evidence does not sustain any of these defenses. The Allen patent was adjudged valid in Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 242 F.2d 17.

■ I am of the opinion that the Allen patent is valid and infringed and find for the plaintiff on all issues.

Defendants filed a counterclaim against plaintiff under Section 4 of the Clayton Act (15 U.S.C.A. § 15) for thrice defendants' damages resulting from certain alleged acts of plaintiff which defendants charge violated 15 U.S.C.A. § 2, commonly known as the Sherman Act.

Plaintiff moved for judgment dismissing the counterclaim on the ground that upon the facts and the law the defendants have shown no right to relief. This motion was made by plaintiff under Rule 41(b), F.R.Civ.P., 28 U.S.C., after the defendants had completed the presentation of their evidence in support of the counterclaim.

The counterclaim charges that plaintiff is attempting to monopolize the market in valves "sized especially for mudline service and having resilient sealing surfaces which render them capable of effectively controlling the flow of abrasive-laden fluids" circulated in the mud supply system of drilling oil wells. The offense charged in the counterclaim was the filing and maintaining of this civil action without justification.

■ The evidence failed to show that any separate market exists in valves with resilient sealing surfaces for mudline service. Rather the evidence shows that such valves in fact compete with valves having metal-to-metal seals used in this and other services. The metal-to-metal valves are sold by numerous manufacturers of valves. The evidence was inconclusive as to any particular portion of the market enjoyed by plaintiff. The evidence doesn't show any alleged illegal act on the part of Cameron other than the filing and maintaining of this civil action on the Allen patent which had already been held valid in Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17.

All of the evidence points toward the good faith of plaintiff in filing and maintaining this suit. There is no evidence that plaintiff had any motive in filing this suit other than a proper motive to enforce its patent against what it considered was an infringement.

■ The act of bringing and maintaining a suit for infringement of a patent cannot, standing alone, be a violation of the Sherman Act. A contrary holding would make a serious inroad on the integrity of the patent system as it would discourage patentees from resorting to the courts to have their controversies determined. This is even the case where the patent has not been previously adjudicated. Jacquard Knitting Machine Co. v. Ordnance Gauge Co., 3 Cir., 1954, 213 F.2d 503; Cole v. Hughes Tool Company, 10 Cir., 1954, 215 F.2d 924 at page 935; and Walker On Patents, Deller's Edition, Volume 2, Section 408.

■ Defendants have not produced any evidence showing legal damage to either of them in their business or prop-

erty, resulting proximately from the alleged unlawful acts. This is a statutory prerequisite to the right of action under 15 U.S.C.A. § 15; Triangle Conduit & Cable Co. v. National Electric Products Corporation, 3 Cir., 1945, 152 F.2d 398, and Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846.

The evidence presents healthy competition in this segment of the valve industry in the true spirit of American free enterprise. Plaintiff's motion will be sustained and a judgment will be entered for plaintiff dismissing the counterclaim.

Following are findings of fact and conclusions of law, separately, (1) upon the issues of validity and infringement of the Allen patent, and (2) upon defendants' counterclaim under the Clayton and Sherman Acts.

### Findings of Fact and Conclusions of Law Upon the Issues of Validity and Infringement

#### Findings of Fact

1. Plaintiff is a corporation incorporated under the laws of the State of Texas, and has a legal, regular and established place of business in the City of Houston, Texas, Southern District of Texas.

2. The defendant Edward Valves, Inc., is a corporation organized and existing under the laws of the State of Delaware, and maintains a regular and established place of business at 1606 Maury Street, in Houston, Harris County, Texas. Defendant Rockwell Manufacturing Company is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania; it has a permit to do business in Texas, and maintains regular and established places of business at 1102 Delano Street and 1606 Maury Street, both in Houston, Harris County, Texas.

3. The parties have stipulated that the court has jurisdiction over the parties and the subject matter of the Complaint and the Counterclaim.

#### Title To the Patent In Suit and Notice

4. The parties have stipulated in the Pre-Trial Stipulation that Letters Patent of the United States 2,606,740 issued to plaintiff on August 12, 1952, and since that date plaintiff has been and still is the owner of said Letters Patent, together with the right to sue for and collect for past infringements.

5. United States Letters Patent 2,606,740 (Allen patent) has been involved in an earlier civil action. In the earlier action, claims 1 and 4 were the only claims involved and on February 27, 1957, they were held valid by the United States Court of Appeals for the Fifth Circuit in Cameron Iron Works, Inc. v. Stekoll, reported at 242 F.2d 17.

6. Plaintiff, prior to filing its application for the patent in suit, constructed and tested experimental valves under the invention of the patent in suit but has not made or sold valves embodying said invention since issuance of the patent. Plaintiff has given defendants actual notice in writing of their infringement of said patent, prior to the filing of the complaint herein; namely, on or about July 25, 1955, and defendants secured a copy of said patent as early as August 27, 1952, and were advised by their counsel of the probabilities of this suit being filed as early as March of 1953.

#### Invention

7. The invention of the Allen patent "relates to valves and more particularly to the form of sealing means adapted to seal against the closure member of the valve when the latter is closed." (Quote from first four lines of patent.) The patent drawings illustrate two screw actuated gate valves and one plug valve. The patent states as its objects:

"The invention has as its principal object the provision of a valve having a fluid pressure actuated sealing means which will not tend to tear off or be blown past the valve closure member while the gate is being opened or closed.

"Another object is to provide the sealing means with a lip which as the valve begins to open will first be uncovered to the high pressure fluid so as to equalize the fluid pressure acting on the two sides of the sealing lip.

"Another object is to provide the sealing means with a lip which will not tend to be blown past the valve closure member as it cracks open in opening the valve."

### The Problem and Allen's Solution

8. The valve of the Allen patent invention has particular use for controlling the flow of gritty substances under high pressures. Such substances include fluids used in the drilling and completion of oil and gas wells, for example, drilling mud, well cement, fluids for fracturing formations, and fluids for acidizing. The valves for such services frequently are rated at 3,000 p. s. i. working pressure and 6,000 p. s. i. test pressure.

9. Prior to Allen's invention there existed a problem as to how to maintain an effective seal which would be actuated by upstream fluid pressure, and at the same time protect the flexible sealing material from damage caused by the valve closure member by reason of the fact that under great pressure such material tended to "bulge" into the housing passage and would be sheared off when the closure member slid past the sealing material. Allen's principal objective was to find a solution to this problem and it was with this objective in view that he evolved the novel concept set forth in the patent which was that of arranging the elements of the valve and sealing ring so that as the closure member moves from open position toward closed position, there is no tendency to cut off the edge of the flexible sealing material.

10. The Allen solution was accomplished by the utilization of lip type seals of soft, resilient, rubber-like material having the relationship to the valve body, and the valve closure member as set forth in the claims of the Allen patent. The effect of this relationship of parts was to provide in a gate or plug valve a seal that would always take place on the downstream side of the closure member. Nevertheless, the valve could be a two-way valve having a sealing mechanism on each side of the closure member as shown in the patent. The Allen patent arrangement is such that the pressure fluid leaks past the upstream sealing mechanism into the interior of the body. The pressure within the body then forces the rubber of the downstream sealing mechanism "into sealing engagement both with the valve housing and with the valve closure member" but "will not tend to be torn off or be blown past the closure while the same is being opened or closed." (Quotes from column 4, lines 48–53 of Allen patent.)

### Validity

#### Prior Art

11. The prior art alleged by defendants to either anticipate the Allen patent or render it lacking in invention includes the prior United States patents of:

Pratt 477,608
Jennings 564,378
Brown 2,433,732
Greve 1,968,200
Allen 2,194,262
Walton 1,947,071

The prior art urged also includes as publications:

"Catalogue of The Pratt & Cady Co." (1912). Pages 68, 69, and 76. (Defs. Ex. 37A)
An advertisement of plaintiff in "Oil and Gas Journal," December 29, 1938, page 127.

The prior art alleged also includes use and sale by the plaintiff of its Flex-Seal valve as illustrated in said "Oil and Gas Journal" publication and said patent Allen 2,194,262 and the patentees named in said prior art patents.

12. Defendants did not notify plaintiff of said Greve or Walton patents under 35 U.S.C. § 282 until six days before the case was set for trial on June 1, 1959, and eight days before the trial actually

commenced. The court in exercising its discretion under said statute allowed the introduction of the Greve patent because plaintiff had actually considered this patent in connection with this litigation more than 30 days prior to the filing of the civil action but excluded the Walton patent because plaintiff had no knowledge thereof until the late notice.

13. The valve advertised at pages 68, 69 and 76 (Defs. Ex. 37A) of the catalog of The Pratt & Cady Company is similar to the valve illustrated in more detail in the Jennings patent. The valve of the catalog differs from Jennings in having a gasket embedded in and carried on each face of the valve gate. The catalog sheets add nothing to the disclosure of the Jennings patent that is pertinent to the Allen patent.

14. Of the prior art patents in evidence none disclose a sealing element or ring having any lips or the equivalent of lips which are subject to shearing action incident to movement of a valve closure member. In Greve, which is the only prior art patent having lips at all, the valve is of a wholly different character not involving the problem to which the Allen invention is directed.

15. The Greve patent 1,968,200 shows a spring actuated automatic check valve included as an integral part of a slush pump. The valve allows flow of fluid through the pump outlet, but prevents backflow through the outlet of the pump. It is in all essentials the same as the valve shown in the upper right-hand corner on Plaintiff's Exhibit 4, which was considered in the earlier civil action, Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 242 F.2d 17. Plaintiff's Exhibit 4 illustrated the long and well-known application of the use of lip seals in this different species of valve that opens by to and fro separation of the valve closure member from the seat. In this species of valve there are no relatively sliding metal parts to damage the seal, as is the case with gate and plug valves. In the Greve valve, the flow can only be in one direction because of the spring. It is only for this reason that lip seals can be used because there is no reverse flow which would blow them out of position. There is no similarity between the lips of Greve and the lips of the Allen patent either from the standpoint of the problem presented, the functioning of the valve, or the arrangement of the sealing mechanism.

16. The Allen patent claims distinguish from Greve as follows:

(a) Claims 1 and 2 recite:

(1) "A chamber for a valve closure member intersecting said passage" (passage through the valve housing).

(2) Sealing rings "on each side of said chamber."

(3) "Fluid pressure actuated lips remote from and *extending away from said passage*". (Emphasis added. In Greve, the lips extend along and form a part of the passage.)

(4) "Said lips * * * when on the *downstream side* of the closure member". (Emphasis added. In Greve, the lips are always on the upstream side of the closure member.)

(b) Claims 4 and 5 recite:

(1) "A rigid part carried by the body, downstream of the valve member". (No comparable part *downstream* of the valve member in Greve.)

(2) "A resilient lip type seal element * * * having one lip *extending away from said body passage*". (Emphasis added. In Greve, the lip extends along and forms one wall of the passage.)

(3) In the Allen claims the entire seal mechanism and channel therefor are recited as being downstream of the closure member while in Greve the valve always seats against the upstream seat.

These structural differences of the claims and the Greve patent valve result in the functional difference between Allen and Greve set forth in the next preceding finding.

17. The term "downstream", used in the Allen patent claims, is not synonymous with the high and low pressure sides of a valve closure member because it is the flow of fluid that may blow a lip seal out of place when a valve is being opened or closed. In Greve, the seal element is always "upstream" and any reversal of direction of pressure differential holds the valve closed so it cannot produce a reverse direction stream flow.

18. The Greve valve would not work if it were modified by the provision of a manual means for moving the valve member to a closed position while flow was taking place in the *reverse* direction to that shown in Greve. The pressure differential of this *reverse* flow would blow the lips between the valve and its metal seat and destroy the lips. This is because the lips form a part of the passage in Greve rather than extending away from the passage as required by claims 1, 2, 4 and 5 of Allen. Also, it would not work as a valve to stop flow in the direction Greve described, because the seal lips would be ineffective, since the seal lips are disposed in a direction opposite to that required for fluid actuation.

19. The Pratt patent shows a conventional wedge type gate valve employing a "seat" ring "f". The "seat" ring differs from a mere "seal" in that it must perform the dual function of supporting the thrust of the gate due to both the wedge action and the pressure acting against the gate and of sealing between the gate and body. The valve has like "seat" mechanisms on both sides of the gate. The seat ring has no lips and seals by virtue of the load it supports on the "seats".

20. The Pratt patent defines the hard, load-bearing characteristics of the "seats" in various language, for example:

(a) It is formed of a composition of India-rubber gum and asbestos fiber "solidified under heat and pressure."

(b) It "will soften slightly and become more elastic, making a closer fit against the gate" when subjected to steam or water.

(c) It is wedge shaped to provide "a narrower bearing-surface."

(d) Grooves f' are provided "to make the seats more elastic and easily compressible."

All of the above statements illustrate that the "seat" of Pratt does not structurally or functionally meet the term "relatively soft yieldable material" as recited in Allen patent claims 1 and 2 or the "resilient lip type seal element" recited in Allen patent claims 4 and 5. The "seat" does not have the "lips" of claims 1, 2, 4 and 5.

21. The seal principle of Pratt is one of external energization by wedging the gate against the seat rings by turning the handwheel. At high pressures the gate conceivably would seal on the multiple area principle on the downstream side only. In either case, the load borne by the seat is relied upon to provide the seal. In Pratt the seat must support the gate because, if it deformed enough to allow the gate to contact the body, the seat material would flow over the body channel edges and be pinched off by the gate.

21A. The seal is not energized by the fluid pressure sealed against working directly on the seat element to deform it into intimate sealing engagement, as is the case with the Allen lip seal. If a resilient lip type seal element were substituted for the hard seat ring of Pratt, and the valve was used for high pressures, the seal ring on the downstream side would be forced by pressure in the body through the groove "g" shown at the bottom of Fig. 1. Thus, Pratt does not have the rigid part recited in claims 4 and 5. This further confirms that Pratt did not disclose the use of any materials for the seat except those possessing load-bearing characteristics.

22. Jennings 564,378 shows a valve quite similar to that of the Pratt patent. The Jennings valve seals upon the Pratt principle of the wedge action being externally energized or at high pressures possibly the multiple area seal. The "seat" rings are stated to be formed "of composition, brass, or any other suitable metal, or they may be formed of asbestos

and rubber composition or similar packing *materials that will suitably withstand the high pressures.*" (Emphasis added.) The "seat" rings, as in Pratt, perform the dual function of supporting the axial thrust of the gate and of sealing.

23. The Jennings seat rings do not meet the following requirements of the Allen patent claims:

(a) Formed of "relatively soft yieldable material" as called for in claims 1 and 2 or a "resilient lip type seal element" as recited in claims 4 and 5.

(b) The lips recited in claims 1, 2, 4 and 5 are not present.

Thus, Jennings does not meet the structural terms of the claims of the Allen patent and it functions upon a different seal principle.

24. The Pratt & Cady Company catalog at pages 68, 69 and 76 (Defs. Ex. 37A) illustrates an iron body wedge type gate valve with renewable "seat" rings. The *hard* material of the "seat" rings is indicated at page 68 where it is stated, "In these valves the seat rings are independent rings of bronze or any special metal or material best adapted for the service in which the valve is to be used. They are firmly held in position without distortion * * *." The valve corresponds in structure and seal principle generally to that shown in Fig. 1 of the Jennings patent but adds some type of ring carried on each side of the gate and embedded therein for cooperating with the "seat" ring.

25. The valve shown and described at pages 68, 69 and 76 of The Pratt & Cady Company catalog does not meet the terms of the Allen patent claims in the same respect that the Jennings patent fails to.

26. Plaintiff is the owner of the now expired Allen patent 2,194,262. Plaintiff has manufactured valves and sold them commercially under this patent under the trademark "Flex-Seal" more than one year prior to the filing of the application which resulted in the Allen patent in suit. The advertisement in the "Oil and Gas Journal", Defendants' Exhibit 40, illustrates the commercial valve as does Defendants' Exhibit 135, drawing numbered 8277. As far as this suit is concerned, the patent, the commercial valve, and the advertisement may all be considered as one.

27. Defendants in answer to interrogatory 14 of Defendants' Answers To Further Interrogatories Propounded By Plaintiff, read into the record, admitted that the Flex-Seal valve does not have lips as called for in the Allen patent in suit, and that this could be determined by mere visual inspection.

28. The Flex-Seal valve seals on the *upstream side* on the principle of creating a sealing engagement between the rubber and the metal parts by jamming the gate or paddle 24 into the mass of rubber. The higher the pressure to be sealed against, the harder the paddle must be forced into the rubber. The seal is effected mechanically instead of by fluid pressure energization, as in the Allen patent. The shoulder on the paddle fits closely with the body and covers the upper part of the rubber when the valve is closed so as to confine the rubber. The sealing function is described in the patent at page 2, column 1, lines 40–58.

29. The Flex-Seal valve does not have the lips called for by claims 1, 2, 4 and 5. Hence, it also does not have a surface on the lips exposed to pressure within the body when the valve is closed to be urged into sealing engagement with the metal parts as called for in claims 1, 2, 4 and 5. It seals on a different seal principle and thus differs from the requirement of the Allen patent claims functionally as well as structurally.

30. The Brown patent 2,433,732 was alleged in defendants' Answer to be an anticipation. However, defendants offered no testimony on this patent, but it is of record as Plaintiff's Exhibit 5.

31. The Brown patent shows a valve with O-ring seals arranged to seal on the upstream side of the valve closure member. In the modification shown in Figs. 1 to 5 of the drawings, the valve is a one-way valve and the O-ring seal element is

carried by the plug. In the modification shown in Figs. 6 to 9, inclusive, the O-ring seal elements are mounted on the body by means of sleeves, but the arrangement is such that it will seal on the upstream side and the seal elements will be blown out of position and cut as illustrated on Plaintiff's Exhibit 6, when sealing against high pressures.

32. The Patent Office considered the Brown reference and made it of record. However, at the same time Brown was cited, the Patent Office allowed the application claims that became claims 1, 2 and 3 of the Allen patent. Thus, the Patent Office ruled that Brown did not anticipate these claims. These claims, and also claims 4 and 5 of the patent, recite the lips and the downstream seal which distinguish Allen from Brown both in structure and function. As shown by the Allen patent file wrapper, the Patent Office received proofs in the form of the Allen affidavit and the exhibits attached thereto which showed Allen conceived his invention before the date of the Brown application and was diligent in reducing it to practice. As a result, the Patent Office removed Brown entirely as a reference. Based upon the evidence in the wrapper, Allen was the first to conceive the invention and was diligent in reducing it to practice. There is no evidence establishing a date for Brown earlier than his filing date of August 27, 1943.

33. If the Patent Office Examiner or the courts in the earlier case had had before them the prior art recited and analyzed in the preceding findings, they would not have been able to have found the structure called for by the claims, as indicated above. Neither would they have been able to find the function set out in the claims in any of this prior art. The Brown patent was considered by the Patent Office and claims 1, 2 and 3 were allowed over it. The Brown patent contains the only disclosure of a pressure energized seal in gate or plug valves in any of this prior art and is, therefore, closer to the invention of Allen than any of the other prior art relied upon by de-fendants, yet Brown fails to disclose or suggest the Allen solution.

34. Although plaintiff does not assert that defendants infringe claim 3 of the Allen patent, defendants attack its validity. Claim 3 incorporates by reference all of the elements of claim 2 and adds further limitations. All of the foregoing findings pertaining to claim 2 are applicable to claim 3.

### The Allen Patent Specification Is Clear and Definite and Discloses An Operable Device

35. The specification of the Allen patent describes the structure and mode of operation of three different embodiments of the Allen invention in language that is clear and definite. The claims of the specification state the invention in terms of structure and function and explain the interaction of the parts.

36. The Allen patent specification states that the lips engage the gate. This stated engagement is a specification of contact between the lips and the valve closure member. This engagement must be augmented by the effect of the pressure forcing the lip against the valve closure member in order to seal against high pressures. This relatively light engagement plus the effect of pressure is inherent in the well-known lip type seal.

37. Tests were conducted in East Chicago, Indiana, in June of 1957 by defendants in the presence of representatives of the plaintiff. Defendants produced a valve which they purported represented the Allen patent, but the seals did not conform to the patent specification. The pictures, Defendants' Exhibits 32I and 32J, clearly show the gaps between the lip and the valve gate and the lip and the body, instead of the engagement called for by the patent specification. These gaps kept the valve from sealing. Gaps were also seen in the tests defendants conducted in court. The tests conducted at plaintiff's plant during the course of the trial used seal rings made according to the Allen patent and

sealed drop tight at pressures up to the highest pressure tested of about 1,000 p. s. i. Plaintiff's Exhibits 9 and 9A and the pictures, Plaintiff's Exhibits 33 to 37, show that in these tests there was engagement between the lip and valve gate, which engagement was observed by the court and the valve did not leak.

The Affidavits and Supporting Exhibits Attached Thereto, of Herbert Allen, Filed With the Patent Office, Were Not A Misrepresentation To the Patent Office

38. The Allen affidavit with its attached exhibits contained in the Allen patent file wrapper was submitted to the Patent Office to show an earlier invention by Allen than that of the Brown patent 2,433,732. The actual evidence relied upon by the applicant was submitted to the Patent Office for its own determination, as exhibits attached to the affidavit. The affidavit merely stated affiant's conclusions as to what was shown in the exhibits.

39. The thorough character of the tests of the first experimental model and the completeness of the reports thereof are borne out by defendants' witness Bean. The Patent Office Examiner after reviewing the actual test reports concluded that the tests proved the invention and withdrew the Brown patent as a reference. Far from misrepresenting the test results to the Patent Office, Allen submitted the actual evidence including the report of a drip leak in test B and of a slight leak at 1,000 p. s. i. and above in the report of test C.

40. The reports of the various tests do not show any damage to the seal lips after repeated tests up to 6,500 p. s. i. pressure. The lips were not blown from their position in the valve and damaged during opening and closing of the valve. This is the primary object of the invention as stated in the patent specification.

41. The test reports show that the big problem encountered in the tests was not with the seal, but was to reduce the torque caused by stem friction. The modification and subsequent test G was directed to this alone. Further, Plaintiff's Exhibit 40 is a booklet showing an additional modification and successful tests of the first experimental valve identified as E-380. Plaintiff's Exhibit 40 also shows that plaintiff constructed and successfully tested two additional 2″ plug valves and one gate valve embodying the Allen invention.

*Infringement*

42. The parties stipulated that defendants manufactured and sold in the Southern District of Texas, since issuance of the Allen patent and prior to the filing of this civil action, valves under the trademark "Mudwonder". Plaintiff's Exhibits 8 and 8A are physical embodiments of such a valve and Plaintiff's Exhibits 10A and 12 are drawings of the seat insert of said Mudwonder valves. Also, Plaintiff's Exhibit 14A is one of defendants' seat inserts. The British patent 749,932 issued June 6, 1956, Plaintiff's Exhibit 13, contains a correct description of the mode of operation of the valve.

43. Defendants have introduced physical devices and drawings illustrative of the "Mudwonder" valve or parts thereof, representing the construction at various stages of the valve's commercialization since 1953. These exhibits include Defendants' Exhibits 16, 28, 29, 30, 31 and 36. The valves or parts thereof, illustrated or exemplified by these exhibits, do not differ in any material respect pertinent to this litigation from the valve of Plaintiff's Exhibits 8 and 8A.

44. The Mudwonder valve is a gate valve composed of a body with a passage therethrough and a chamber intersecting the passage. A seat insert with two rigid spaced apart metal rings is mounted in the chamber and has openings forming a part of the passageway. Surrounding each of the rigid metal rings and extending outwardly therefrom are resilient soft yieldable rubber-like seal elements contained in channels formed between the body and the rigid parts.

The two resilient seal elements are connected by a crescent shaped bridge which is reinforced by a metal plate on its underside. A valve gate is mounted to move up and down in the chamber and between the metal rings and the rubber-like seal elements. The lower end of the gate is curved to conform substantially to the curve on the upper surface of the crescent shaped bridge. When the valve is closed, the side faces of the gate engage the confronting inner side faces of the resilient seal elements above the bridge. The outer side faces of the seal elements engage confronting machined surfaces on the valve body.

45. Plaintiff on its Exhibits 10A and 12 has identified by red coloring the lip portions of the seat insert. These extend completely about the passage on the faces of the seal elements that confront the body and extend around three fourths of the circumference on the faces that confront the gate.

46. Defendants at the trial contended that their valve seat insert has no lips, but they used the term "lips" in describing the seat insert of the "Mudwonder" valve in the report of their research engineer C. C. Stevens, Plaintiff's Exhibit 21, at page 4, as late as June 27, 1955. The Edward men in talking of the insert spoke of the "lips" and the term was used in defendants' application for United States patent on the Mudwonder valve as first prepared in referring to the seals. The term "lips" was not deleted from the patent application until approximately July 1, 1953, as shown by Plaintiff's Exhibit 25.

47. The lips of the Mudwonder valve seat insert, including their ridge portion, function in the same manner to provide the seal as do the lips in the Allen patent. Each Mudwonder seal ring has two lips, one engaging the gate and the other the body. On each lip, engagement is provided for by the ridge portions. This engagement is variously called "engagement", "interference", or "precompression". The engagement is not tight enough to seal off the pressure to be contained. Thus, the pressure fluid leaks by the lips on the upstream side of the gate to pressurize the chamber. The fluid pressure in the chamber works against the exposed surface of the downstream lips forcing the rubber into tight sealing engagement with both the gate and the body. This augments the initial engagement of the lips with the gate and body. Under pressure the gate is supported by the metal rigid ring on the downstream side and the rubber sealing lip is fluid pressure energized to seal the joint between the gate and rigid part and between the rigid part and the body. This is illustrated by Plaintiff's Exhibit 19 and Defendants' Exhibit 29.

48. In the Mudwonder valve the seal is provided for the gate by the lip on the downstream side, which engages the gate all the way around the passage with the exception of the part covered by the bridge. The seal is provided by the bridge on the lower section. The lips engaging the body on the downstream side seal completely about the passage.

49. The lips of the Mudwonder, that engage the gate, throughout their extent function exactly as the lips in the Allen patent in opening and closing of the valve. These lips, when on the downstream side of the gate, are supported by the rigid, inner, metal part at any time that a pressure differential exists across them. As the gate is raised in opening, the pressure is first equalized across the lip and then the metal inner support is uncovered. This situation exists throughout the opening and closing movements at all times that the gate is separated from the bridge. Thus, as in the Allen patent, the lips are not blown from position by the pressure as the valve is operated.

50. The Mudwonder valve meets literally the terms of claims 1, 2, 4 and 5 of the Allen patent. There are resilient seal elements which extend about the flow passage on each side of the gate. This is stated in defendants' British patent, at page 5, column 1, lines 12 to 19. The bridge joins the seal elements at their lower portion. The lip which engages the gate does not extend completely

about the passage, but the Allen patent claims in defining the invention do not recite that the lip extends completely about the passage. Neither the Allen patent specification nor the prior art limit the invention to "lips" that completely surround the passage so as to exclude the Mudwonder valve where the "lips" extend only approximately three fourths of the way around the flow passage.

51. The Mudwonder valve meets the terms of the claims from the standpoint of structure and function, and from the standpoint of the interaction of the parts. Without the lip action, there would be no seal, and the lips, because of their arrangement conforming to the wording of the claims, are not blown out of place when the valve is opened and closed under pressure. Neither the Allen patent claims nor the prior art limit the shape of the "lip". Indeed Greve, in Fig. 3, shows lips with both acute and obtuse angles and explains that they "act in substantially the same manner" as the more conventionally shaped lips shown in Fig. 2.

52. The manner in which the gate seals against the bridge is described in the report of C. C. Stevens, defendants' research engineer, Plaintiff's Exhibit 21, at page 5 under the heading "Throttling Action" and more particularly in the last two paragraphs of that heading. This portion of the Mudwonder sealing mechanism is outside the teaching of the Allen patent, but does not affect the sealing action of the lips. To the extent that the lips are employed, they are the sole sealing means extending approximately three fourths of the way around the flow passage.

53. The prior art and the file wrapper of the Allen patent do not restrict the claims as to the form of the lips or as to the extent of the lips. The lips of the Mudwonder seat insert, as defined above, are lips both in structure and in function or manner of sealing as called for by the patent claims.

### Deliberate and Wilful Character of Infringement

54. The infringement was deliberate and wilful, defendants having proceeded with their program of completing the development of and commercializing the Mudwonder valve after having been advised by their counsel as early as March 13, 1953, that plaintiff was almost certain to bring suit for infringement. Defendants received a copy of the Allen patent as early as August 27, 1952.

55. Defendants have here urged that the Mudwonder seal has no "lips", but this is contradicted by their own usage of the term under normal circumstances in conversation and technical reports. Defendants' defense of misuse and their counterclaim for antitrust violation were based on this "no lips" theory of noninfringement that was inconsistent with their own general usage of the term.

56. Defendants' tests to attempt to show that the Allen patent was inoperable were inconsistent with their tests in November of 1952 when they tested the Allen principle and the valve was still holding pressure after 1,929 openings and closings under pressure. Defendants' court and Chicago tests were misleading in that they did not duplicate the Allen patent but intentionally departed therefrom by providing gaps between the lips and gates, and lips and body, instead of the engagement as called for by the patent.

### *Plaintiff Has Not Misused the Allen Patent*

57. As indicated in the foregoing findings relating to infringement, the Mudwonder valve so closely resembles the Allen patent disclosure that it fully meets the terms of claims 1, 2, 4 and 5 thereof from the standpoint of both structure and function. Therefore, plaintiff had good cause to file and maintain this civil action to submit the question of infringement to the courts.

58. There is no evidence showing an overt act of plaintiff to monopolize or attempt to monopolize any portion of

the valve industry and defendants' only allegation of such act is the filing and maintaining of the suit to enforce its patent.

59. Healthy competition exists in the market supplying valves to the oil and gas well drilling industry for service in mud lines, well cementing, formation fracturing and other services in which plaintiff's Flex-Seal valve and defendants' Mudwonder valve are used. Each of these valves competes with valves manufactured and offered for sale in use in these services by numerous valve manufacturers.

60. Plaintiff's Flex-Seal valve was protected by United States patent 2,-194,262 until its expiration on March 19, 1957. Its past popularity for certain uses has been due to the excellence of the product, the protection once afforded by the now expired patent, and proper sales efforts, and not from any illegal or unfair practices.

61. The Flex-Seal and the competing valves have been sold for the most part by a large number of supply stores operated in the oil fields. The supply stores are owned by supply companies that are unrelated to plaintiff and operate independently of plaintiff. Plaintiff has no power to control these supply stores and there is no evidence that it has attempted to do so.

62. The resilient seated Flex-Seal and Mudwonder valves compete with metal-to-metal seated valves, both lubricated and non-lubricated. The competing metal seated valves are manufactured by several of the large manufacturers of valves.

63. Resilient seated valves compete with metal seated valves except where temperatures higher than about 300° F. or the chemical composition of the fluids prevent their use. There is no market of "mudline valves with resilient sealing surfaces" separate and apart from the general market of valves of the proper pressure ratings capable of controlling flow of abrasive laden fluids.

64. The magnitude of annual sales of "mudline valves with resilient sealing surfaces" was not established in the evidence with any reasonable certainty. Also, plaintiff's particular share of the sale of such resilient seated valves has not been established with any reasonable certainty.

65. Neither defendant has proved it has suffered any legal damages to its business or property by reason of any acts of plaintiff alleged in the counterclaim to be unlawful.

## Conclusions of Law

1. This court has jurisdiction of the parties.

2. This court has jurisdiction of the cause of action alleged in the Complaint under the patent laws of the United States.

3. The Allen patent in suit issued to plaintiff and plaintiff still is the owner thereof together with all claims for damages for infringement thereof.

4. The prior art offered in evidence by the defendants does not anticipate any of the five claims of the Allen patent in suit.

5. Each of the five claims of the Allen patent in suit sets forth a structure which involves invention over the prior art.

6. The Allen patent in suit and each of the claims thereof are good and valid in law.

7. The claims express the novel concepts constituting the gist of Allen's invention and such concepts are set forth in terms of a combination of elements, and their cooperative, physical and functional relationship which contribute to the new result.

8. Herbert Allen is the first inventor of the subject matter claimed in said Allen patent in suit.

9. Defendants and each of them, in their manufacture and sale of valves under the trademark "Mudwonder" as exemplified by Plaintiff's Exhibits 8 and 8A and of valves with seat inserts as

illustrated in Plaintiff's Exhibits 10A, 12 and 14A, have infringed claims 1, 2, 4 and 5 of said Allen patent which claims read directly on said Mudwonder valves.

10. The claims of the Allen patent read literally upon said "Mudwonder" valve which embodies the invention defined therein, without resorting to a broad construction or the application of a broad range of equivalence.

11. Plaintiff has not, since the issuance of the Allen patent, manufactured or sold valves coming under the Allen patent or any of its claims and, therefore, no notice of infringement was required of plaintiff by law under 35 U.S.C. § 287.

12. The proceedings in the Patent Office by reason of which said Allen patent issued and the prior art before the court do not estop plaintiff from asserting a scope for claims 1, 2, 4 and 5 of said Allen patent broad enough to encompass said Mudwonder valves.

13. The inventor Herbert Allen and the plaintiff as assignee of Herbert Allen's application for patent that issued into the Allen patent in suit did not make any material misrepresentations to the Patent Office in securing the withdrawal of the Brown patent 2,433,732 as a reference.

14. Plaintiff, in filing and maintaining this civil action and in the conduct of its business, acted in good faith and not for the purpose of monopolizing or attempting to monopolize any substantial portion of commerce controllable by Congress in violation of the antitrust laws of the United States and has not misused its patent.

15. Plaintiff has not misused the Allen patent.

16. The plaintiff is entitled to an injunction against further infringement of the Allen patent in suit, to an accounting, and upon final judgment for proper damages, and to an award of costs.

17. Defendants' infringement of the Allen patent was deliberate and wilful.

*Findings of Fact and Conclusions of Law in Support of Judgment Dismissing Defendants' Counterclaim*

### Findings of Fact

1. Plaintiff is a corporation incorporated under the laws of the State of Texas, and has a legal, regular, and established place of business in the City of Houston, Texas, Southern District of Texas.

2. The defendant Edward Valves, Inc., is a corporation organized and existing under the laws of the State of Delaware, and maintains a regular and established place of business at 1606 Maury Street, in Houston, Harris County, Texas. Defendant Rockwell Manufacturing Company is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania; it has a permit to do business in Texas, and maintains regular and established places of business at 1102 Delano Street and 1606 Maury Street, both in Houston, Harris County, Texas.

3. The parties have stipulated that the court has jurisdiction over the parties and the subject matter of the Counterclaim.

4. Plaintiff brought this civil action in good faith to submit to the court for determination plaintiff's charge that defendants infringed United States patent 2,606,740 by manufacturing and selling their "Mudwonder" valve. Plaintiff's purpose in filing and maintaining this civil action was to enforce its patent which had been previously declared valid by the United States Court of Appeals for the Fifth Circuit in Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17.

5. There is no evidence showing an overt act of plaintiff to monopolize or attempt to monopolize any portion of the valve industry and defendants' only allegation of such act is the filing of and maintaining of this civil action to enforce its patent.

6. Healthy competition exists in the market supplying valves to the oil and gas well drilling industry for service in

mud lines, well cementing, formation fracturing and other services in which plaintiff's Flex-Seal valve and defendants' Mudwonder valve are used. Each of these valves competes with valves manufactured and offered for sale in use in these services by numerous valve manufacturers.

7. Plaintiff's Flex-Seal valve was protected by United States patent 2,194,262 until its expiration on March 19, 1957. Its past popularity for certain uses has been due to the excellence of the product, the protection once afforded by the now expired patent, and proper sales efforts, and not from any illegal or unfair practices.

8. The Flex-Seal and the competing valves have been sold for the most part by a large number of supply stores operated in the oil fields. The supply stores are owned by supply companies that are unrelated to plaintiff and operate independently of plaintiff. Plaintiff has no power to control these supply stores and there is no evidence that it has attempted to do so.

9. The resilient seated Flex-Seal and Mudwonder valves compete with metal-to-metal seated valves, both lubricated and non-lubricated. The competing metal seated valves are manufactured by several of the large manufacturers of valves.

10. Resilient seated valves compete with metal seated valves except where temperatures higher than about 300° F. or the chemical composition of the fluids prevent their use. There is no market of "mud line valves with resilient sealing surfaces" separate and apart from the general market of valves of the proper pressure ratings capable of controlling flow of abrasive laden fluids.

11. The magnitude of annual sales of "mud line valves with resilient sealing surfaces" was not established in the evidence with any reasonable certainty. Also, plaintiff's particular share of the sale of such resilient seated valves has not been established with any reasonable certainty.

12. Neither defendant has proved it has suffered any legal damages to its business or property by reason of any acts of plaintiff alleged in the counterclaim to be unlawful.

Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of the counterclaim.

2. Plaintiff had good cause to file and maintain the civil action brought on its Complaint filed herein for infringement of United States Letters Patent 2,606,-740, and such action was filed and maintained by plaintiff in good faith without any illegal intent to monopolize or to attempt to monopolize any portion of the valve industry.

3. There is no market for "mud line valves with the resilient sealing surfaces" separate and apart from the general market of valves of the proper pressure ratings capable of controlling flow of abrasive laden fluids because of competition offered by the metal-to-metal seated valves of this general market.

4. Defendants have not been severally or jointly injured or damaged in their business or property by reason of plaintiff's acts which defendants have alleged violate the antitrust laws of the United States and thus would not be entitled to relief even though plaintiff's acts did constitute a violation of the antitrust laws.

5. Plaintiff has not violated the antitrust laws of the United States.

6. The counterclaim should be dismissed.

Filed with the clerk herewith are separate judgments (1) for plaintiff upon its suit for validity and infringement of the Allen patent, and (2) dismissing defendants' counterclaim.

Copies hereof will be forwarded by the clerk to the attorneys of record.