UNITED STATES of America, Plaintiff-Appellee,

v.

Dennis GREEN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Gladys DAVIS, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Arthur FAULKNER, Jr., Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Edward R. GAYLES, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

· v.

Nathanial SPURLARK, Defendant-Appellant.

Nos. 13849–13853.

United States Court of Appeals Seventh Circuit.

Feb. 12, 1964.

Rehearing Denied in Nos. 13849, 13852 and 13853 and Opinion Modified March 9, 1964.

George F. Callaghan, George N. Leighton, R. Eugene Pincham, Claude W. B. Holman, Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

Arthur Faulkner, Jr., pro se.

Frank E. McDonald, U. S. Atty., John Powers Crowley, Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., of counsel, for the United States.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

KILEY, Circuit Judge.

Appellants appeal from their conviction, by a jury, after a thirteen day trial on an indictment charging a conspiracy to violate the narcotics law.[1] The five appeals were consolidated in this court.

In deciding the issue whether there was evidence upon which the jury could infer guilt of defendants beyond a reasonable doubt, we must take the testimony and reasonable inferences most favorable to the government. United States v. Glasser, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), United States v. Micele, 327 F.2d 222 (7th Cir. 1964).

Thigpen,[2] at defendant Spurlark's direction, purchased narcotics from Katy Lewis from 1951 through 1956. After her death in 1956 Spurlark directed Thigpen to purchase from defendant Willard Jones.[3] In 1958 Spurlark directed him to pick up narcotics from defendant Gladys Davis. In 1958 Thigpen twice sold narcotics received from Spurlark to Narcotics Agent Bailey. From 1952 to 1955 witness[4] Wilson purchased narcotics from Spurlark and Lewis. He also arranged for his wife to purchase from them. Later Wilson bought narcotics from defendant Green and Green told him "you know Ted [Spurlark] and I are in business together * * * my partner." Witness William Smith purchased narcotics from Spurlark in 1953 and 1954 and thereafter from Katy Lewis until her death. After her death, Smith, at Spurlark's direction, bought narcotics from Jones and then from Gladys Davis. From 1952 to 1954 Evans[5] bought narcotics from Green, and later from Spurlark and Katy Lewis. In 1955 Spurlark told witness Mardis that he was putting Green "in charge of all activity on the west side."

In 1955, in a conversation at which Evans, Green, Spurlark and Mardis were present, Evans was told Green was to take over the sale of narcotics on the west side. Late in 1955, with Green's permission, Evans and defendant Faulkner "combined" their business for the sale of narcotics on the west side for a few months. In June of 1956 Faulkner and Spurlark brought narcotics back from New York to relieve a "shortage" in Chicago. Evans purchased narcotics from Green from 1955 to 1959 except for a two month period when, in Green's absence, he bought from Faulkner.

Witness Rouzer of Detroit made several purchases from Spurlark in 1955. In 1958, at Spurlark's direction, Rouzer

---

1. A conspiracy in violation of 21 U.S.C. § 174.

2. An unindicted co-conspirator.

3. Appellant in No. 13854, not consolidated with these causes.

4. "Witness," as used in this opinion, designates those who are neither defendants nor unindicted co-conspirators and who testified at the trial.

5. An unindicted co-conspirator.

twice went to Gladys Davis' apartment to await narcotics deliveries. And twice Spurlark sent Gladys Davis to Detroit to get money from Rouzer for Spurlark.

It is needless to detail more of the testimony which amply justified the jury in the inference that at the center of this narcotics web was Spurlark, holding it together, and operating from the Rodeo Lounge on Chicago's south side, through Dennis Green, Evans and Faulkner on the west side, and through the late Katy Lewis, Jones and Gladys Davis on the south side.

The testimony against defendant Gayles, an attorney, did not link him in any way with the sale or distribution of the narcotics. There is testimony favorable to the prosecution, however, and the inferences the jury could reasonably draw, to show that he was more than an attorney for the defendants; and that he knowingly participated intentionally, Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), in aiding his co-defendants, and others, from late 1954 to 1959, in carrying out their illegal enterprise: "After 1953" he was a manager, along with defendant Green, in the Morticians Underwriters Association, in which Spurlark and Faulkner had made investments. Gayles was present at the meeting and conversations in his home attended by Spurlark, Wilson, and police officers who were planning the arrest of "Big John," a competitor of Spurlark's whom the latter said "some people" wanted to "bust." Gayles told Wilson to be careful about telephones and tape recorders, and to use gloves when handling packages because the police "will be trying to get" him. Gayles told Evans and Faulkner to stay away "from around the Setup" tavern because police officers were looking for them. He told Evans that he would need "five hundred" to fix a case, after confirming that Green would vouch for the money.

There is no merit to the contention of defendants that more than one conspiracy was shown, to their prejudice, by the evidence, or that the evidence showed merely a number of unrelated episodes.[6] There is testimony to show that Spurlark, beginning in 1952, was the source from which the narcotics flowed to his south and west side minions; and that Gladys Davis, Evans and Faulkner operated to some extent on both the south and west sides of the distribution structure. The jury could infer from this evidence that each defendant knew, or should have known, of the conspiracy. Poliafico v. United States, 237 F.2d 97 (6th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957). It was not necessary that each co-conspirator knew all others or that each witness mention all, or that each one be involved throughout the entire span of seven years. United States v. Micele, 327 F.2d 222 (7th Cir. 1964). A fluctuation of the membership during the span of this record of continuous activity cannot be compared to the facts in United States v. Russano, 257 F.2d 712 (2d Cir. 1958), where the evidence established two conspiracies, with a break between the two. The rule in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is not applicable here, because the evidence shows but one conspiracy with Spurlark at the center and several conspirators radiating from him. The trial court properly denied motions for severance on grounds of variance or misjoinder.

Since the cases of Johnson and Williams were severed during trial, there is no merit to Gayles' contention of prejudicial joinder. The court, in ruling against Gayles' proffer of testimony of his pre-conspiracy participation in arrests of co-defendants, weighed the probable prejudice to Spurlark and Green against the probable gain to Gayles from the testimony. We see no abuse of discretion in the ruling, and cannot see er-

---

6. For example, the sale by Spurlark to witness Minnett Maljohn in 1958, who took the purchased goods to Davenport, Iowa, established that the "white powder" Spurlark was selling was heroin hydrochloride.

ror in denying him a severance because he could not, otherwise, introduce the testimony.

■ Gayles proffered an instruction which told the jury that Gayles' representation of co-defendants for narcotics violations was insufficient to prove his participation or membership in the conspiracy. It then went on to state, in the abstract, rights and duties of attorneys [7] in defense of alleged violations of law. The trial court read this instruction as tending to direct a verdict of not guilty, and added the following cautionary paragraph:

"You are not to infer from the foregoing however, that an attorney has any special status which permits him to perform an unlawful act, or to join an unlawful conspiracy, nor may he knowingly assist a client to commit an unlawful act or to further an unlawful conspiracy."

We cannot say the court misread the proffered instruction, nor that the modification directed a guilty verdict or otherwise prejudiced Gayles, nor that the paragraph was without an evidentiary basis.

■ Gayles tendered an instruction dealing generally with jury's consideration of the use of narcotics as an element in determining credibility. Faulkner offered an instruction naming government witness Evans as a ten-year addict prior to August, 1961, and stating his testimony should be received with "extreme caution and suspicion" and be given serious consideration only when corroborated. The court refused to give these instructions.

The court gave thorough instructions regarding credibility and weight of testimony, beginning:

"You have heard much discussion of the question of the credibility and weight you are to give to the testimony of the particular witnesses. Let me be as explicit as I can on that."

The instruction went on to inform the jury that they were "sole judges" of credibility; that the presumption that a witness speaks the truth is rebuttable by the manner in which he testifies, the character of his testimony, or contradictory evidence; that in weighing the testimony of each witness they were to give *careful scrutiny* (our emphasis) to the circumstances of his testimony, his demeanor on the stand, his relation to the government or to defendants, the manner in which the verdict might affect him, and the extent to which he is contradicted; and that they could consider promises of immunity or hope of reward in weighing the credibility of the witness, and the effect of any false testimony they might find on other testimony of the witness. The instruction told the jury of its right to examine the evidence "closely and carefully in the light of the common knowledge and experience of mankind * * * and your own" in determining credibility.

The court was clearly correct in rejecting Faulkner's instruction naming witness Evans. And in different words the substance of Gayles' instruction was covered.

Defendants admit that Evans' history as an addict was brought out "with commendable candor" by the government and.

---

7. "It is the right and duty of a lawyer to undertake the defense of a person accused of a crime, regardless of his personal opinion of the guilt of the accused. Otherwise, innocent persons, victims only of suspicious circumstances may be denied proper defense.

"Having undertaken such defense the lawyer is bound by all fair and honorable means to present every defense that the law of the land permits, to the ends that no person may be deprived of life or liberty, except by due process of the law.

"Under the law an attorney may not reveal or disclose to law enforcement agencies or to anyone, any information revealed to him by his client. And the fact that an attorney does not inform or advise law enforcement agencies of any information revealed to him by a client is not in any way to be taken or construed against said attorney."

there is no complaint that cross-examination of him was unduly limited. Defendants' expert witness' opinion was that Evans testified "to the best of what would be his normal ability," and government's expert's testimony would justify the inference that Evans had "kicked the habit" several months prior to testifying.

Fletcher v. United States, 81 U.S.App. D.C. 306, 158 F.2d 321 (D.C.Cir. 1946), is distinguishable because the district court there refused to instruct the jury that the informer's testimony should receive greater scrutiny and care than the ordinary witness'. The court of appeals pinned the decision to the "facts of this case" where the testimony of the informer, addict and dope peddler, was uncorroborated and the only testimony against Fletcher. And People v. Bazemore, 25 Ill.2d 74, 182 N.E.2d 649 (1962), is to the same effect. The inference here could be that Evans was not an addict, that his testimony had been corroborated, and that the instruction was sufficiently cautionary. The dictum in Fletcher about "the well recognized fact" of an addict being "inherently a perjurer" is not pertinent. Here, under the instruction the jury knew Evans' testimony should be carefully scrutinized. The circumstances here do not fall under the reversible error test laid down by the court in Phelps v. United States, 252 F.2d 49, 53 (5th Cir. 1958).

We see no merit in the contention that the district court committed reversible error by refusing to give the instructions tendered by Gayles and Faulkner.

The court's instruction is criticized too for stating that "a witness is presumed to tell the truth * * *" and we are referred to Judge Brown's concurring opinion in Knapp v. United States, 316 F.2d 794 (5th Cir. 1963), where the only witnesses were government witnesses. The majority did not reverse; it did not approve the instruction on the facts there. What Judge Brown said, with no idea of reversible error, of the "presumed to tell the truth" statement was said in relation to an accompanying instruction and we think does not relate to the instruction here.

We see no need of discussing other claims of error in the giving, or refusing, of other instructions. We have considered the claims and find that the court's instructions included in substance all proffered instructions that were proper and that the instructions given were not erroneous.

The rule in United States v. Falcone, 109 F.2d 579 (2d Cir. 1940), affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, does not apply to render reversible error the testimony of Wilson regarding Gayles and Spurlark, and testimony of Mardis as bondsman. Neither does the hearsay rule exception discussed in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), nor the rule in Grunewald v. United States, 353 U.S. 391, 401–404, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), apply to the testimony of Evans against Gayles. These items of evidence in the context of all the evidence, related above, render the rules inapplicable; the jury could conclude the events testified to were in furtherance of the conspiracy, not merely legitimate transactions; and not a "subsidiary conspiracy" of events after the alleged conspiracy ended. And we see no error in the cross-examination of Gayles about the Morticians Association and see no reversible error in the cross-examination about his trips with other men, and women not their wives.

In view of United States v. Garfoli, 324 F.2d 909 (7th Cir. 1963), and because of what was sought, we see no abuse of discretion in the trial court's denial of Green's motion for a bill of particulars.

Various other alleged errors, asserted by the different defendants, have been considered, but we find them to be without substance. We find no reversible error as to any of the defendants.

The judgments are affirmed.