**UNITED STATES of America**

**v.**

**JOHNS–MANVILLE CORPORATION, Keasbey & Mattison Company, Robert F. Orth, Louis F. Frazza, Robert R. Porter, Norman L. Barr, and James R. Reichel.**

Cr. No. 21118.

United States District Court
E. D. Pennsylvania.

Dec. 4, 1963.

Memorandum Sur Defendants' Request for Ruling etc. Dec. 31, 1963.

Order Sur Motions of all Defendants for Judgments of Acquittal
April 16, 1964.

See also D.C., 213 F.Supp. 65; D.C., 225 F.Supp. 61.

Raymond K. Carson, Kenneth R. Lindsay, Rodney O. Thorson, Department of Justice, Washington, D. C., for the Government.

Henry T. Reath, Philadelphia, Pa., Bradley M. Walls, New York City, for Keasbey & Mattison Co., Norman L. Barr & James R. Reichel.

Thomas D. McBride, Philadelphia, Pa., Ralph M. Carson, New York City, for Johns-Manville Corp., Robert F. Orth and Louis F. Frazza.

Joseph W. Swain, Jr., Philadelphia, Pa., for Robert R. Porter.

VAN DUSEN, District Judge.

## MEMORANDUM SUR DEFENDANTS' SUGGESTED ORDER REQUIRING THE UNITED STATES TO ESTABLISH BY INDEPENDENT EVIDENCE THE CONSPIRACY AND MEMBERSHIP OF THE CONSPIRATORS THEREIN

Defendants have asked for this provision in the pretrial order (paragraph 27):

"27. The Government shall be required to establish by prima facie evidence (1) the existence of the conspiracy charged in the indictment; and (2) membership in the conspiracy of

"(a) each defendant before offering the ex parte acts or declarations of one defendant against another defendant,

"(b) each defendant and each non-defendant conspirator before offering the ex parte acts or declarations of a non-defendant conspirator against any defendant."

The general rule is that a prima facie conspiracy should be shown before the acts and/or declarations of a conspirator are admissible against the other conspirators.[1] There are cases where acts[2] and declarations of co-conspirators were admitted against the other conspirators before proof of the conspiracy.[3] A conspiracy may be shown by: a course of dealings,[4] tacit under-

---

1. 6 Toulmin, Antitrust Laws, 616.

2. United States v. Sansone, 231 F.2d 887 (2nd Cir. 1956), cert. den. 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956).

3. Parente v. United States, 249 F.2d 752 (9th Cir. 1957); United States v. Clancy, 276 F.2d 617 (7th Cir. 1960), reversed on other grounds 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Rizzo v. United States, 304 F.2d 810 (8th Cir. 1962), cert. den. sub nom. Nafie v. United States, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962).

4. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

standing, agreement or acquiescence,[5] circumstantial evidence,[6] and acts and declarations of the co-conspirators.[7]

■ This court is bound by the rulings of the Supreme Court of the United States, which has said:

"In order that the declarations and conduct of third parties may be admissible in such a case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves." [8]

■ Part (2) of the above paragraph 27 is dependent upon the court's discretion. A series of cases support the following proposition:

"The order in which evidence is received is within the discretion of the trial court and, therefore, error could not be predicated upon the admission of evidence as to the acts of an alleged co-conspirator prior to proof that the defendant was connected with the conspiracy." [9]

However, proof that the co-conspirator, whose declarations are admitted against the other defendants, has joined the conspiracy must be from an independent source.[10]

■ ■ It is noted that evidence which may fall under the terms of the above-quoted suggested paragraph 27 may be admissible for other reasons. Alleged criminal violations committed by agents of the two defendant corporations may be admissible under the general rule that where "[t]here is an officer or agent of a corporation with broad express authority, generally holding a position of some responsibility, who performs a criminal act related to the corporate principal's business. * * * the courts have held that so long as the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have 'authorized' the criminal act." [11]

Additional reasons for the admission of acts or declarations of corporate agents against their principals are discussed in cases such as United States v. United Shoe Machinery Corp., 89 F.Supp. 349 (D.Mass.1950).

■ Concerning the foundation upon which documents may be admitted under the Federal Business Records Act, 28 U.S.C.A. § 1732(a), the federal courts have held that it is not a requirement in a criminal case that the person who actually prepared the subject record testify concerning it. In United States v. Olivo, 278 F.2d 415 (3rd Cir. 1960), where a witness testified to the mode of preparation in the trade and then within his company, it was held that the paper was properly admitted, even though no em-

5. United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed. 2d 823 (1963).

6. United States v. Manton, 107 F.2d 834 (2nd Cir. 1938).

7. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

8. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L. Ed. 260 (1917).

9. Landers v. United States, 304 F.2d 577 (5th Cir. 1962); Rizzo v. United States, supra, fn. 3; United States v. Copeland, 295 F.2d 635 (4th Cir. 1961), cert. den. 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388

(1962); United States v. Sansone, supra, fn. 2; Newman v. United States, 156 F.2d 8 (9th Cir. 1946), cert. den. sub. nom. Cain v. United States, 329 U.S. 760, 67 S.Ct. 115, 91 L.Ed. 655; United States v. Pugliese, 153 F.2d 497 (2nd Cir. 1945).

10. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), rehearing den. Kretske v. United States, 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222; United States v. Boyance, 215 F.Supp. 390 (E.D.Pa.1963).

11. Continental Baking Company v. United States, 281 F.2d 137, 149 (6th Cir. 1960); United States v. Armour & Co., 168 F.2d 342 (3rd Cir. 1948).

ployee from the particular branch where the paper was prepared testified. The court stated at page 417:

"* * * it [the Federal Business Records Act] was intended to eliminate the technical requirement of proving the authenticity of records and memoranda by the testimony of the maker." [12]

■ The trial judge contemplates including language such as the following in the pre-trial order, since the above authorities do not justify the use of the language used in the above-mentioned paragraph 27 as submitted by defendants:

"Wherever the Government does not plan to establish by prima facie evidence (1) the existence of the conspiracy charged in the indictment; and (2) membership in the conspiracy of

"(a) each defendant before offering the ex parte acts or declarations of one defendant against another defendant on the ground that they are acts or declarations of a co-conspirator,

"(b) each defendant and each non-defendant conspirator before offering the ex parte acts or declarations of a non-defendant conspirator against any defendant on the ground that they are acts or declarations of a conspirator,

the Government shall submit a written offer of proof to the trial judge and counsel for defendants the trial day before calling such witness to explain why it is not feasible to establish (1) and (2) above before showing such acts or declarations, unless the trial judge, for cause shown, dispenses with such requirement."

MEMORANDUM SUR DEFENDANTS' REQUEST FOR RULING THAT 28 U.S.C.A. § 1732 IS INAPPLICABLE IN THIS CASE (DOCUMENT 153)

On December 6, 1963, defendants filed with the pre-trial judge their MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR A PRE-TRIAL RULING THAT 28 U.S.C.A. § 1732, RELATING TO THE ADMISSIBILITY OF BUSINESS RECORDS, IS INAPPLICABLE IN A CRIMINAL PROCEEDING, which has been docketed as Document 153. This Memorandum, relying on the Sixth Amendment provision that "the accused shall enjoy the right * * * to be confronted with the witnesses against him," concludes with the following language at page 10:

"III. *Conclusion*

"For the above stated reasons the defendants request that the Court rule that 28 U.S.C.A. § 1732 is inapplicable in the present case."

This request for ruling must be denied in view of the federal appellate cases on this subject. In United States v. Leathers, 135 F.2d 507, 511 (2nd Cir. 1943), the court said:

"The appellant Thomas argues that the records in question would not be admissible under the early common law rules and that the recent judicial and statutory changes we have referred to are in contravention of the Sixth Amendment. But statements by relatives as to pedigree, declarations against interest, and most important of all in criminal trials, dying declarations, have long been recognized as admissible. It is not necessary to say what limits the Sixth Amendment may set to the extension of exceptions to the rule against hearsay. Probably the permissible extension is a question of degree. We think that business records kept as a matter of ordinary routine are often likely to be more reliable than dying declarations. It cannot be reasonably argued that the extension of the common law book entry rule which we discussed in Massachusetts Bonding & Ins. Co.

---

12. United States v. Quong, 303 F.2d 499 (6th Cir. 1962), where the records were

"taken" from defendant's co-conspirator; Bisno v. United States, 299 F.2d 711 (9th

v. Norwich Pharmacal Co., supra, or the statute cited above, involve any violation of the Sixth Amendment." Similarly, other federal appellate courts have stated that "the Sixth Amendment does not prevent creation of new exceptions to the hearsay rule based upon real necessity and adequate guarantees of trustworthiness" [1] in the light of the requirement of confrontation of the Sixth Amendment. See, also, Kay v. United States, 255 F.2d 476, 480–481 (4th Cir. 1958), where the court said:

> "Admission of the certificate did not deprive the defendant of his right of confrontation by witnesses. Neither the Sixth Amendment to the Constitution of the United States nor Article I, Section 8 of the Constitution of Virginia can be said to have incorporated the rule against hearsay evidence, as understood at the time of their adoption. Each was intended to prevent the trial of criminal cases upon affidavits, not to serve as a rigid and inflexible barrier against the orderly development of reasonable and necessary exceptions to the hearsay rule.

> "The power of the Congress and of a state legislature to provide for the admission of evidence is not subject to any such arbitrary limitation as the defendant supposes. They may carve out a new exception to the hearsay rule, without violating constitutional rights, where there is reasonable necessity for it and where it is supported by an adequate basis for assurance that the evidence has those qualities of reliability and trustworthiness attributed to other evidence admissible under long established exceptions to the hearsay rule."

In Tot v. United States, 319 U.S. 463, 467, 63 S.Ct. 1241, 1244–1245, 87 L.Ed. 1519 (1943), the court said:

> "The rules of evidence, however, are established not alone by the courts but by the legislature. The Congress has power to prescribe what evidence is to be received in the courts of the United States."

The question may arise, when a document falling under 28 U.S.C. § 1732 (a) is offered at the trial: does that statute transgress the right of confrontation granted by the Sixth Amendment? No blanket pre-trial ruling, as requested by defendants, is possible on this record. Similarly, the undersigned agrees with the contention of the above Memorandum that all documents covered by 28 U.S.C. § 1732(a) may not be admissible in a criminal trial and that the trial judge has the duty to determine whether such documents are constitutionally admissible under the Sixth Amendment guarantee of confrontation.

---

Cir. 1962), where chronological files of defendant were regularly maintained by his secretary.

[1] See Matthews v. United States, 217 F.2d 409, 418 (5th Cir. 1954). The cross-examination, which the right of confrontation as granted by the Sixth Amendment guarantees [see Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911); Brown v. United States, 234 F. 2d 140, 144–145 (6th Cir. 1956)], is not essential in situations covered by proper exceptions to the hearsay rule. Cf. Robertson v. Baldwin, 165 U.S. 275, 281–282 17 S.Ct. 326, 41 L.Ed. 715 (1897), where the court said:

"The law is perfectly well settled that the first 10 amendments to the constitution, commonly known as the 'Bill of Rights,' were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. * * * Nor does the provision that an accused person shall be confronted with the witnesses against him prevent the admission of dying declarations, or the depositions of witnesses who have died since the former trial." See, also, 5 Wigmore, Evidence (3rd Ed.), p. 127, § 1397.

▆ Although there are many reports, such as those made primarily for use in litigation, as opposed to use in conduct of the business (in this case, making and selling asbestos-cement pipe), which are not admissible under 28 U.S.C. § 1732(a) (see Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1942)), some accounting records of the corporate defendants covered by the language of 28 U.S.C. § 1732(a), for example, may be admissible in this case without producing the person who made them. See Palmer v. Hoffman, supra, at 112–113, 63 S.Ct. 477, including footnotes 2 and 3, and United States v. Olivo, 278 F.2d 415, 417 (3rd Cir. 1960), as well as cases cited above. The Government should produce the maker of any important record wherever possible, having in mind the language of the federal courts on this subject [2] and the language of the Sixth Amendment.[3]

### ORDER SUR MOTIONS OF ALL DEFENDANTS FOR JUDGMENTS OF ACQUITTAL

And Now, April 16, 1964, it is ordered that:

(A) the Motion of defendant Robert R. Porter for judgment of acquittal on all counts is granted; and

(B) the Motions of defendants Robert F. Orth, Johns-Manville Corporation, and Keasbey & Mattison Company for judgment of acquittal are denied as to Count One and granted as to Counts Two and Three.

### Part (A) of Order

See Document 179, being MEMORANDUM OF RULINGS ON OBJECTIONS TO EXHIBITS OFFERED AGAINST DEFENDANT PORTER dated April 9, 1964.

### Part (B) of Order (Count One)

▆ The evidence justifies a finding that the corporate defendants, during the period from 1954 to 1959, arranged for meetings of their subordinate employees to achieve uniformity in their price lists (note testimony that the purpose of the first meeting was to make prices uniform by raising K & M prices about 5% and J-M was to "bring (their prices up) accordingly"—N.T. 3033). After the meetings, the Vice President of K & M approved the resultant price lists with minor changes, if any. Deviations from the price lists involving reductions were discussed between representatives of the companies and usually approved if not substantial (N.T. 3029–30, 3084–7, 3155–6, 3159, and 3166–9). The list prices of the corporate defendants remained substantially identical until the date of the Indictment (6/1/62).

By the year 1958, the volume of A-C (asbestos-cement) pipe imported from Europe was such as to cause both corporate defendants concern and their competition with it was vigorous. They expressed the desire to prevent it from securing a foothold in this country. At meetings in Europe, 1959 and 1960, defendant Orth, a Vice President of Johns-

2. For example, in Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 18 F.2d 934 (2nd Cir. 1927), the court said at page 938:
"The judge must be satisfied from the whole situation that the added credence to the document which the testimony of the entrants will bring does not justify the expense and difficulty of getting them to the trial. It ought to appear that the document was itself prepared under a routine which warrants its reliability; that the missing entrants, if called, would in the nature of things have no recollection of the events recorded and could do no more than corroborate the existing testimony as to the course of business in which they had a part; that either be-
cause of their number, their distance from the place of trial, the difficulty of finding them, or for other reasons, the burden of producing them would be unreasonably heavy upon the proponent. These considerations are not exhaustive, rather they illustrate the nature of the question, and the proper approach to its solution."

3. The Government's MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR A PRE-TRIAL RULING THAT 28 U.S.C.A. § 1732, RELATING TO THE ADMISSIBILITY OF BUSINESS RECORDS, IS INAPPLICABLE IN A CRIMINAL PROCEEDING, received December 19, 1963, has been attached to this Memorandum and is being filed with it.

<sub></sub>

Manville in charge of Pipe Sales, complained of the unstabilizing effect of sales of European A-C pipe on the prices in the United States and the importance of stabilizing such prices (see Exhibit A). At these meetings, the restriction of imports of European A-C pipe to a definite amount were discussed and efforts were made by defendant Orth to secure some restrictions on imports (N.T. 7973) and price stabilization (see Exhibit A).

The jury may consider this evidence in its case against Keasbey & Mattison, its sole stockholder being Turner & Newell, Ltd., at least in connection with the efforts by Mr. Orth to secure agreement of the European importers to stabilization of prices and restriction of imports:

A. In June 1959, Mr. Costa testified that at a meeting in Brussels, attended by Mr. Colton, Vice President of Johns-Manville International, Mr. Colton stated that Mr. Orth would come to Europe to discuss exports of A-C pipe from Europe to the United States with the European manufacturers of A-C pipe present at that meeting (N.T. 7895). On the evening of this meeting, Mr. Costa saw Mr. Colton in the presence of Mr. Bateman (managing partner of Turner & Newell, Ltd., which owned all the stock of Keasbey & Mattison Co.) in the hotel lobby (N.T. 7898–7900).

B. Mr. Costa testified at N.T. 7941 concerning the Paris meeting of March 1960:

" * * * we raised * * * the question * * * even supposing that we make an arrangement with Johns-Manville, what about Keasbey & Mattison? In other words, if they do their own selling policy, what is the use of finding any arrangement whatsoever?

"And I remember Mr. Orth saying that we should not have worried about it, because he would have gone to London to see Turner and Newell on the subjects of Keasbey & Mattison, or something like that. I don't remember when he said, when, or tomorrow or within a week, or that I don't remember."

Mr. Koons testified at N.T. 9338–9340 that Mr. Orth had stated at the March 1960 Paris meeting that "he had the permission to make agreements for and on behalf of Keasbey & Mattison, vis-a-vis Turner & Newell, who were in London, * * *." Mr. Orth stated that he had seen Mr. Suthill, one of the top managers of Turner & Newell, Ltd., in London (N.T. 9340). The day following this Paris meeting, Mr. Orth said he was returning to London (N.T. 9339–9340). On cross-examination, Mr. Koons testified that he does not believe Mr. Orth mentioned "Keasbey & Mattison" by name at the Paris meeting of March 1960 (N.T. 9799).

C. The activities of Mr. Orth at the European meetings were in furtherance of the ends and aims of the conspiracy in which the jury may find Keasbey & Mattison had been participating since 1954.

There is sufficient evidence, of the type described above, in the record from which a jury may find beyond a reasonable doubt [see United States v. Allard, 240 F.2d 840 (3rd Cir. 1957), and United States v. Giuliano, 263 F.2d 582, 584–585 (3rd Cir. 1959)] a single, common plan, design and scheme constituting one conspiracy, rather than several. See Blumenthal v. United States, 332 U.S. 539, 553 and 556–558, 68 S.Ct. 248, 92 L.Ed. 154 (1947);[1] cf. Kotteakos v. United States, 328 U.S. 750, 771, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). It is noted that in Blumenthal the court found that the jury might find two separate agreements between different parties, some parties being common to each agreement, could be steps in the formation of a larger, ulti-

1. The language at 556–557, 68 S.Ct. at 256 makes clear that the Government need not show knowledge by each conspirator of all the activities of his co-conspirators in furtherance of the common plan, such as the sales of Asbestolite pipe, if the jury should find them in unreasonable restraint of trade. See Continental Ore Co. v. Union Carbide, etc., Corp., 370 U.S. 690, 699 and 707, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962).

mate and more general conspiracy. On this record, there is sufficient evidence to justify the jury in finding that the activities of the corporate defendants from 1954 to 1958 in pricing and the activities of Mr. Orth in the same pricing field, as well as in his alleged efforts to restrict imports by allocation agreements or otherwise, were "all directed to achieving a single unlawful end or result" of unreasonably restraining trade and commerce. See Blumenthal v. United States, supra, 332 U.S. at 558, 68 S.Ct. at 257. See, also, United States v. Green, 327 F.2d 715, 717 (7th Cir. 1964).

See Exhibit B.

■ Defendant Johns-Manville Corporation moves for judgment of acquittal on the ground that the Government has introduced no evidence to establish liability of Johns-Manville Corporation, as distinguished from its subsidiaries, Johns-Manville Sales Corporation, Johns-Manville Products Corporation, and Johns-Manville Products Corporation of California. The motion, insofar as it is based on this argument, must be denied. N. L. R. B. v. Deena Artware, Inc., 361 U.S. 398, 403, 404, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Anderson v. Abbott, 321 U.S. 349, 362–363, 64 S.Ct. 531, 88 L.Ed. 793 (1944), and cases there cited, especially United States v. Milwaukee Refrigerator Transit Co., 142 F. 247 (E.D.Wisc. 1905); Eastern Industries v. Traffic Controls, 142 F.Supp. 381, 384 (D.Del. 1956); United States v. Watchmakers of Switzerland Inf. C., 134 F.Supp. 710 (S.D.N.Y.1955); In re Investigation of World Arrangements, etc., 13 F.R.D. 280, 285 (D.C.D.C.1952); United States v. United Shoe Machinery Co., 234 F. 127, 140–143 (E.D.Mo.1916); Restatement, Agency 2d, § 14M and Reporter's Notes thereto; see, also, Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904); United States v. Goldberg, 206 F.Supp. 394, 405 (E.D.Pa.1962).

There is sufficient evidence for the jury to find beyond a reasonable doubt either or both of the following:

(1) The corporate existence of the subsidiaries apart from the parent was mere form and the agents of the subsidiaries acted as agents for the parent, all of the corporations being one unitary enterprise.

(2) The subsidiaries were agents of the parent, and the employees of the subsidiaries acted as sub-agents of the parent corporation.

See N. T. 7935; see notes of testimony and Government exhibits cited by Government counsel at N.T. 10,076–10,081 and pages 1–9 of brief of Johns-Manville Corporation (Document 187).

The Government has not established that the American Society for Testing and Materials and the American Waterworks Association are co-conspirators or that they had knowledge of the conspiracy. Hence, the jury will be instructed to disregard § 7(b) and (c) of the Indictment (Document 1), which shall be considered as having been deleted therefrom.

*Part (B) of Order (Count Two)*

■ Under the decision in American Tobacco Co. v. United States, 328 U.S. 781, 784–786, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946), the Government is required under Count Two of the Indictment to submit evidence which establishes beyond a reasonable doubt that defendants have conspired to acquire or maintain the "power to control and dominate interstate trade and commerce in a commodity to such an extent that they are able, as a group, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power." At page 809, 66 S.Ct. at 1138–1139, the court said:

"A correct interpretation of the statute and of the authorities makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign na-

tions, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power."

■ There is no evidence in this case from which the jury could find beyond a reasonable doubt that the defendants conspired to acquire or maintain power to raise prices or exclude competition in the relevant market. Although the Indictment alleges that the trade or commerce involved is asbestos-cement pipe and couplings (see pars. 8–12),[2] the evidence shows that the primary competitors for each of the corporate defendants were the sellers of metal pipe. N.T. 1273, 1274, 1277, 1278, 2081, 2099, 2101–2, 2108, 2109, 2151 and 5441. For example, the 1960 Business Condition Report of Johns-Manville's Los Angeles Pipe District Office (GX–1253, p. 1) states concerning the outlook for 1961: "The competition is going to be tougher than we have yet experienced, both foreign and domestic—in A–C as well as metal pipes." At p. 3 of this Report, it is stated: "The steel pipe competitors have been even more aggressive than in the past." See, also, GX–1257, p. 2; GX–1256, p. 2; GX–1207, p. 3; GX–1209, p. 2; GX–1204, pp. 2 & 4; GX–1258, p. 3; GX–1259, pp. 2 & 6. The record is also replete with testimony concerning sales of concrete pipe (GX–1257, p. 3; N.T. 2053), tile pipe (N.T. 2049–53), plastic pipe (GX–1253, p. 4), clay pipe (GX–1257, p. 2; N.T. 2049–53, 2078, 2080), steel and wood pipe (N.T. 2086, 3036, 3084, 3180), etc., even though the only evidence of economic power in the field relates to the volume of asbestos-cement pipe sold by defendants. There is every indication in this record that the above types of pipe were "reasonably interchangeable" by consumers for the same purposes, except in certain soils such as are present in southwest Texas. See United States v. E. I. Du Pont, 351

U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Even in such soils, plastic, tile and concrete pipe were used. In the Du Pont case, supra, the court said at page 394, 76 S.Ct. at page 1006–1007:

"But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others."

The power of defendants to raise prices and to exclude competition might be negligible if the total sale of these apparently interchangeable products were substantially in excess of the sales of asbestos-cement pipe. The Government has clearly not sustained its burden of proof on this element of the crime charged in Count Two.

■ In its oral argument, the Government took the position that the language of footnote 23 on page 395, 76 S. Ct. on page 1007 of the Du Pont case, supra, made proof of the relevant market immaterial on a charge of conspiracy to monopolize pursuant to 15 U.S.C. § 2 Apparently, the Government takes the position adopted in Lessig v. Tidewater Oil Company, 327 F.2d 459, 474–475 and 478, where language used at 474–475 was qualified on rehearing (9th Cir. 1964). However, the language in the above-mentioned footnote only states that "the scope of the market was not in issue" in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). An examination of that case indicates that neither counsel nor the court considered the issue of what was the relevant market and that the parties conceded, apparently, that interstate trade and commerce in vegetable parchment paper was a sufficient description of that market. To adopt the Government's position would be to disregard the approach of the above-cited decisions of the United States Su-

2. A conspiracy to unreasonably restrain interstate and foreign trade and commerce in asbestos-cement pipe and couplings is alleged in Count One, a conspiracy to monopolize such trade and commerce is alleged in Count Two, and attempts to monopolize such trade and commerce are alleged in Count Three.

preme Court and the language concerning relevant market in such recent decisions as International Boxing Club of New York v. United States, 358 U.S. 242, 249–251, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

### Part (B) of Order (Count Three)

The absence of evidence to prove beyond a reasonable doubt the existence of a relevant market of the type of trade and commerce alleged in the Indictment, as discussed under Count Two above, requires a grant of judgment of acquittal under Count Three. The evidence produced by the Government indicates that the fact that several types of pipe other than asbestos-cement pipe were actively competing with it may have had a controlling effect on the power to raise prices and to exclude competition. In American Tobacco Company v. United States, supra, the Supreme Court of the United States quoted with approval the following language from the trial court's charge:

> "The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment."

This language was based on previous statements of the Supreme Court of the United States over many years, requiring not only intent but a "consequent dangerous probability" of the accomplishment of that intent. Swift and Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). See United States v. Winslow, 227 U.S. 202, 218, 33 S.Ct. 253, 57 L.Ed. 481 (1913), and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, fn. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). More recent federal cases have stated that an attempt to monopolize "means the employment of methods and practices which are utilized for the spe-cific purpose and with the specific intent to achieve or build a monopoly, and which, if successful, would be likely to accomplish such monopolization." See Kansas City Star Company v. United States, 240 F.2d 643, 663 (8th Cir. 1957). Such cases have discussed the relevant market and considered whether the evidence could establish beyond a reasonable doubt that the defendants' activities "would be likely to accomplish" monopolization. There is no proof in this record which would justify the jury in finding beyond a reasonable doubt that the activities and plans of the defendants, "if successful, would be likely to accomplish" monopolization, in view of the absence of any evidence concerning the relationship of competing pipes to the relevant market. Footnote 23 of the Du Pont case, supra, does no more than point out that certain cases cited there were distinguishable because they involved attempts to monopolize, rather than the question of monopolization, which was before the court in the Du Pont case. At the end of the footnote, the court considered United States v. Aluminum Company of America, 148 F.2d 416 (2nd Cir. 1945), because it did involve the question of monopolization and pointed out that the court did make a finding in that case of the relevant market. There is no statement in the footnote that, in a case involving a charge of attempt to monopolize under 15 U.S.C. § 2, the Government may produce evidence which concerns only the product of two manufacturers where this same evidence shows active competition and interchangeability between that product and several other similar products. The ability to raise the price of this product (asbestos-cement pipe) may well depend upon the activities of competitors producing the competing product, and the ability to exclude foreign competition in this product may also be affected by the activities of such competitors producing other types of pipe. The factual background of the Lessig case, supra (see, for example, 327 F.2d pages 469–470 and qualifying language on rehearing in the last paragraph on page 478), makes the

above-mentioned language in that case inapplicable to this record. Also, it is noted that the Lessig case, supra, was a civil case, where the plaintiff's burden is not as great as that of the Government, which must establish every element of its case beyond a reasonable doubt.

The above viewpoint is supported by several civil cases involving charges of attempt to monopolize under 15 U.S.C. § 2: Cameron Iron Works v. Edward Valves, Inc., 175 F.Supp. 423 (S.D.Tex. 1959); United States v. Singer Mfg. Co., 205 F.Supp. 394 (S.D.N.Y.1962). The Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) uses this language at pages 47–48:

"It is sometimes suggested that the words 'any part' of trade or commerce in section 2 refer merely to an amount of business sufficient in volume to overcome the objection *de minimis non curat lex*. But the concept of 'the market' is not brought into the antitrust laws by the words 'any part' in Section 2; rather it is integral to the basic concept of 'monopolization,' and the ideas of competition and monopoly on which it rests. Thus, Section 2 of the Sherman Act deals with monopolizations affecting *markets* which constitute 'any part' of the trade or commerce covered by the Act. To be sure, an appreciable amount of commerce is a 'part' of commerce, but control over an appreciable amount of commerce does not necessarily mean control over an identifiable market which constitutes an appreciable 'part' of commerce.

\*   \*   \*   \*   \*   \*

"Sometimes the part of commerce affected by the defendants' conduct will also be a market; but this does not necessarily follow. Without a finding as to the market involved, there is no way of determining whether or not the defendants have given degree of market power."

The briefs of counsel have been placed in the Clerk's file as Documents Nos. 186–190.

### EXHIBIT A

MISCELLANEOUS REFERENCES TO TESTIMONY OF MR. COSTA THAT MR. ORTH WAS CONCERNED WITH PRICE CUTTING IN THE UNITED STATES AND WAS INTERESTED IN STABILIZING THE UNITED STATES PRICES

N.T. 7922–3 Costa testified to discussion by Orth at Zurich in the summer of 1959 on the effect of cut-throat competition of foreigners on prices and his desire to stabilize prices.

N.T. 7930 Mr. Costa testified to discussion by Mr. Orth at Brussels, Belgium, in February 1960 (N.T. 7926) of "several cases, individual cases, of extreme competition" in the United States. Mr. Orth was complaining of price cutting as the result of sales of imported pipe and the falling price level (N.T. 7932). Mr. Orth was prepared to discuss the details ("This tender, or that tender, or that tender" \*), but others present could not discuss the detailed facts without the presence of their "American agents." For this reason, it was decided to have a meeting with the American agents, which it was decided would be held in Paris in March 1960 (N.T. 7930–1 and 7933).

### EXHIBIT B

The defendants contend that Toulmin, Antitrust Laws, is, at best, a secondary source, a collection of dicta, and that the citation of 6 Toulmin, Antitrust Laws, 200, 201, on page 1 of Document 142, is not binding upon this court (N.T. 10,-092). Suffice it to say that the court's examination of that reference, and the 13 cases cited in the footnotes there, reveals that Toulmin has stated the general rules relating to the continuity of a conspiracy and its relation to the statute of limitations accurately and succinctly. It was more convenient for the court to cite that work for the propositions quoted than to

\* The witness used the word "tender" to refer to "bid" (N.T. 7932).

include its own quotes from, and references to, many cases, most of which are included in Toulmin's footnotes. That general rule, set out on page 1 of Document 142, is the law which is binding upon this court. More particularized references may be found in Hyde v. United States, 225 U.S. 347, 368–369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913), and Continental Baking Co. v. United States, 281 F.2d 137, 154 (6th Cir. 1960).