**UNITED STATES of America**
v.
**Rudolph E. BOYANCE et al.**
**Cr. No. 20914.**

United States District Court
E. D. Pennsylvania.
March 7, 1963.

See also 30 F.R.D. 146.

Lawrence Prattis, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Daniel J. DiGiacomo, Philadelphia, Pa., for defendant Feldman.

LUONGO, District Judge.

Rudolph E. Boyance, Lenox B. Markley, William Keifaber, Edward Ellis, Herman Myron Feldman, Edwin Bescoe, Samuel Gold and John David Roberts were charged in count 1 of this indict-

ment with conspiracy to possess, conceal, pass, deliver, sell, transfer, etc., counterfeit $20 Federal Reserve notes in violation of 18 U.S.C.A. § 371. Boyance and Keifaber were also charged in counts 2 through 5 of the same indictment with the substantive offenses of possessing and delivering counterfeit $20 notes

Boyance, Bescoe and Roberts pleaded guilty. The remaining defendants were tried by court and jury. Keifaber, Ellis, Feldman and Gold were found guilty on the charge of conspiracy and Keifaber was also found guilty on the substantive offenses charged in counts 3 and 4. The jury returned a verdict of "not guilty" on the conspiracy charge against Markley and, by a directed verdict, Keifaber was acquitted on the substantive offense charged in count 2.

The four convicted defendants filed post trial motions, all of which have since been withdrawn except Feldman's motions for judgment of acquittal, or in the alternative, for a new trial. Feldman's motions are before me for consideration and will be discussed together. The grounds asserted by Feldman are generally (1) variations between the indictment and proof; and (2) alleged trial errors.

**1.** *Variations between indictment and proof:*

Two variations have been alleged, (a) that a single conspiracy was charged and multiple conspiracies were proven, and (b) that Feldman was charged with conspiring within the Eastern District of Pennsylvania and the proof failed to show that he was ever present within this district.

■ The testimony, viewed in the light most favorable to the government (United States v. Carlucci, 288 F.2d 691 (3rd Cir., 1961), cert. den. 366 U.S. 961, 81 S.Ct. 1920, 6 L.Ed.2d 1253 (1961) ; United States v. Amedeo, 277 F.2d 375 (3rd Cir., 1960) reveals the following:

In April 1961, defendants Boyance and Keifaber were in possession of a quantity of counterfeit $20 Federal Reserve notes, one of which was given by Boyance to a Mr. Crudo from whom it was seized by Treasury agents. The occurrence was testified to by Crudo and the note was identified as a counterfeit and put in evidence.

Roberts, one of the defendants, testified that he met Boyance in jail and upon Roberts' release from jail he was picked up by Boyance and Keifaber and recruited by them to pass "bad" $20 notes, which he did.

Carmen Motto, a special agent for the Treasury Department, testified to negotiations wherein he, posing as "Nickey Spina" from New York, dickered with Boyance and Keifaber for the purchase of counterfeit $20 notes from them. The negotiations commenced in April 1961 and continued off and on into May when Boyance informed Motto that he was sending two persons to New York to see him to make a deal.

Bescoe (Boyance's brother-in-law) and Ellis were the persons who went to New York on that mission. Bescoe testified he was to get $18,000 of good money from Motto, there was to be an interval of an hour or so after the receipt of the good money, and Ellis was then to obtain $100,000 of counterfeit money from someone whom Ellis knew, after which Motto would be told where to pick up the counterfeit notes. The deal fell through when Motto refused to deal except on a hand to hand basis and Bescoe and Ellis returned to Philadelphia.

In June 1961 a new prospective customer appeared. He was Al Wood, who was in fact a special employee or informant for the Treasury Department. Wood had met Bescoe in Detroit. He learned from Bescoe that he had access to counterfeit $20 notes through his brother-in-law, Boyance. Bescoe and Wood travelled together from Detroit to meet Boyance at his home and thereafter the three met with Keifaber and negotiations for the purchase of counterfeit $20 notes by Wood were had. An agreement was arrived at and Boyance, Keifaber, Bescoe and Wood drove to the railroad station in Newark, New Jersey

where there was to be an exchange of bad money for good. Keifaber and Boyance's source for the counterfeit money, a person referred to as "Muzzy" failed to appear. This name had been mentioned in Bescoe's presence several times as the source of the counterfeit. Both Keifaber and Boyance made telephone calls in an attempt to reach their source. When he left the telephone booth, Keifaber stated that "Muzzy" didn't want to make the deal.

Following that failure, Boyance, in the presence of Bescoe, introduced Wood to Ellis who thereafter informed Wood that in dealing through Boyance and Keifaber he was dealing with the wrong persons, since he (Ellis) was the contact and the only one who could make the deal for counterfeit money. He explained that the others had gone with him on prior occasions to pick up some samples and that they went back without his knowing it.

From Wood's testimony it appears that there were numerous discussions between him and Ellis about obtaining counterfeit $20 notes. In the beginning of July 1961, he went to New York with Ellis where they met one Oberman and as a result of that meeting, Ellis made a telephone call addressing the person to whom he was speaking as "Muzzy". Ellis gave Wood the address, 180 Prospect Street, East Orange, New Jersey, to write down. The two then went to that address to an apartment where the name on the bell was "H. Myron Feldman". When they entered the apartment Ellis greeted Feldman by the name "Muzzy" to which Feldman responded, referring to Ellis as "Eddie". Feldman indicated that he knew they were there for the "twenties". After taking certain precautions as to Wood's identity, Feldman announced the terms on which he would deal, stating that he had gotten rid of enough of the counterfeit money and was not "hurting", that he had a substantial quantity left that was buried, and that he would not take chances. The terms dictated by Feldman were that Wood was to bring good money to Feldman and several hours later he would be told where he could pick up the counterfeit. As evidence of his good faith, Feldman offered to give Wood a note against his bank account. Although a deal was arranged, it was not consummated, apparently because of suspicions Feldman had about Wood. When the efforts to obtain counterfeit money from Feldman proved unsuccessful, Ellis then led Wood to Gold who made attempts to secure counterfeit money from another source but his efforts proved unsuccessful.

In addition to the testimony of the several witnesses referred to, telephone company records were produced indicating that calls were made from the hotel room in New York where Ellis and Wood had stayed to a telephone in East Orange listed in the name of M. Feldman; calls from that hotel room to Ellis' home in New Jersey; a call from Wood's room at the Essex Hotel in Philadelphia to the telephone in East Orange listed in the name of M. Feldman; and numerous calls during the period in question from Boyance to Ellis.

Feldman testified as part of his defense. He denied Wood's testimony as it related to Feldman's involvement with dealings in counterfeit money. Significantly he admitted having had business dealings with Ellis and that Ellis had brought Wood to his, Feldman's, apartment. He testified that Wood offered to buy counterfeit money from him but that he had flatly refused, disclaiming any knowledge of counterfeit money. Feldman admitted, in the course of his testimony, that a warehouse which he used in his business was located within a mile or so of the Newark railroad station.

### (a) Multiple Conspiracies:

Feldman contends that the evidence sustains no proof of a single conspiracy, that if the government proved anything it proved multiple conspiracies, a fatal variance between pleading and proof under the holding of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct.

1239, 90 L.Ed. 1557 (1946). Such a contention is not unusual in complex conspiracy cases and the frequency with which it is asserted led the court, in Lefco v. United States, 74 F.2d 66 (3rd Cir., 1934) to comment at page 68:

"There is nothing new in this defense of multiple conspiracies and nothing uncertain in the law arising from such a defense. Of course, to sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not sustain the verdict. From this statement of law defendants, when in extremity, commonly resort to the contention that, not knowing all the conspirators or not knowing all the others were doing, they are responsible only for what they themselves were doing when caught, and as that usually is only a part of the conspiracy, they say, the part being less than the whole, it is different from the whole and in consequence is not the conspiracy alleged in the indictment and, for lack of proofs, they should be acquitted."

The plea of multiple conspiracies was recently rejected by the Court of Appeals for the Fourth Circuit in United States v. Wenzel, 311 F.2d 164, 167 (4th Cir., 1962) a case which likewise involved a counterfeit money distribution ring. The following language from that opinion is peculiarly applicable here:

"The pattern of this conspiracy was plain and uncomplicated. It had for its object the realization of profit by the foisting upon the public of counterfeit money. To accomplish this the counterfeits had to be obtained and they had to be put in circulation. Mucherino furnished the money to Agresti and the latter, along with appellant and other associates, arranged to put it into circulation by Lockett and the younger Wenzel. It is immaterial that Mucherino or Agresti or the appellant may not have known the persons that Lockett recruited to help him in uttering the money, or that these persons were not among the group which originally planned the illegal enterprise."

■ In evaluating the quantity and quality of the evidence certain basic principles are useful as guides in determining whether the proof establishes a complex, yet single conspiracy or multiple conspiracies.

"* * * conspiracies involving * * * elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.

"The law does not demand proof of so much. * * *" Blumenthal v. United States, 332 U.S. 539, 556, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947), reh. den. 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425 (1948).

"Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. * * * All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the conspiracy. Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before. * * * Nor does the mere fact that conspirators individually or in groups perform different tasks to a common end split up a conspiracy into several different conspiracies. * * *" Lefco v. United States, supra, 74 F.2d at 68–69; United States v.

Lester, 282 F.2d 750 (3rd Cir., 1960), cert. den. 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961); also see United States v. Lipsky, 309 F.2d 521 (3rd Cir., 1962).

The summary of the evidence hereinabove set forth does not disclose the formation of a conspiracy by proof of a specific meeting at which express agreements were entered into, but such is not required. Hernandez v. United States, 300 F.2d 114 (9th Cir., 1962). The evidence does support an almost undeniable inference, certainly one which the jury was justified in drawing, that the defendants joined together at various stages in a common effort to market counterfeit $20 Federal Reserve notes. Their roles appear to be the following: Feldman had large amounts of counterfeit $20 notes under his control and was the source and supplier, in wholesale quantities, of the counterfeit money. Boyance, Keifaber and Bescoe sought prospective customers for the counterfeit notes and also recruited persons for passing the notes. Ellis was the liaison between Feldman and Boyance, Keifaber and Bescoe. Roberts was one of the persons recruited to pass the notes. Gold was used as a lead to an alternative source for the counterfeit money.

Whether or not the proof in a particular case establishes a single conspiracy charged in an indictment or establishes several conspiracies which have not been charged is a question of fact for the jury. Lefco v. United States, supra, 74 F.2d at page 69. The issue here was submitted to the jury with instructions that the essence of a conspiracy "is a common design and purpose applicable to all members" and if the jury found that any of the defendants were not members of the single conspiracy here charged but were members of a separate conspiracy not charged, those defendants should be acquitted. No exceptions were taken to the charge although full opportunity was given to take exceptions or to request additional instructions. By its verdict, the jury found that all the defendants, including Feldman, were participants in the single conspiracy charged in the indictment. There is ample support in the record for the jury's finding.

(b) *Conspiring "within" the district:*

The other alleged variation is that the indictment charged Feldman with conspiring "within the Eastern District of Pennsylvania" and the proof fails to disclose that he was ever present or committed any acts within this district. He does not challenge the jurisdiction of this court, for he concedes that all members of a conspiracy may be prosecuted where the conspiracy was formed or where any overt act was committed. Finley v. United States, 271 F.2d 777 (5th Cir., 1959), cert. den. 362 U.S. 979, 80 S.Ct. 1065, 4 L.Ed.2d 1014 (1960). His point is that he was charged in the indictment with having conspired "within" this district, consequently there was a fatal variation when the proof failed to disclose that he did anything in furtherance of the conspiracy within the district. His position is untenable. An indictment is sufficient if it puts the accused on notice of the charge against him and is sufficiently detailed to protect him against double jeopardy. This indictment, as worded, was sufficient to put Feldman on notice of the charge against him and it is sufficiently detailed in names, dates and overt acts to protect him against a similar charge in the future. Such variance as there was between the indictment and the proof cannot be said to " 'affect the substantial rights' of the accused". Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

2. *Alleged trial errors:*

(a) *Admission of declarations of co-conspirators:*

Feldman complains that at several points in the trial, over his objection, testimony was received of declarations by co-conspirators purporting to involve Feldman in the conspiracy before there was any showing that Feldman was a party to the conspiracy. Dec-

larations of one conspirator in further-ance of the objects of the conspiracy are admissible against a co-conspirator who was not present when the declarations were made if there is proof *aliunde* that the latter is connected with the conspir-acy. Glasser v. United States, 315 U.S. 60 at page 74, 62 S.Ct. 457 at page 467, 86 L.Ed. 680 (1942), reh. den. 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222 (1942). Each time objection was made in the course of the trial the court gave precau-tionary instructions to the jury to the effect that it was to consider such state-ments only against those persons who made the statements or those who were present when the statements were made, and they were not to be considered against an absent defendant unless and until the absent defendant was tied into the conspiracy by independent evidence. The admission of such evidence is proper in the trial of multiple defendants so long as proper precautionary instructions are given. Torrance v. Salzinger, 297 F.2d 902 (3rd Cir., 1962). Those instructions were repeated in the court's charge in the following language:

> "Whether or not any particular defendant was a member of, or par-ticipated in the common plan, must be established beyond a reasonable doubt by evidence as to that defend-ant's own conduct, what he himself said or did. (N.T. 767.)

> \*　\*　\*　\*　\*

> "If and when it appears beyond a reasonable doubt from the evi-dence that a common plan did exist, and that a defendant was one of the members, then the acts knowing-ly done and the statements knowing-ly made by any other person, like-wise found to be a member, may be considered by you as evidence in the case as to each defendant found to be a member, even though the acts done and the statements made oc-curred in the absence and without the knowledge of the absent defend-ant, provided that the acts done or the statements made were during the existence of the common plan and in furtherance of the purposes and objectives of the plan.

> "To summarize, you may not use the statements made by any of the alleged conspirators against a par-ticular defendant to prove that the particular defendant was a member of the plan or conspiracy. That membership must be proved by the acts or statements of the defendant himself.

> "But once membership has been so proved, then you may consider the acts and statements of any other member of the conspiracy against the particular defendant so found to be a member, so long as the acts and statements were during the con-tinuance of the plan and conspiracy and in furtherance of it." (N.T. 768–769.)

The precautionary instructions at the time the testimony was received and the instructions given in the charge to the jury were proper and were adequate to protect Feldman's rights.

### (b) *Reference to photograph of defendant:*

▮▮▮ During the testimony of Treas-ury Agent Sweeney, who was called to corroborate the testimony of Wood, he stated that "a photograph of the individ-ual we knew as Muzzy was exhibited to Wood." Sweeney was then asked and he answered another question unrelated to the photograph. As the assistant United States attorney was posing the next succeeding question, Feldman's counsel objected and asked that refer-ence to the photograph be stricken. The belated motion was granted. Feldman now claims that reference to the photo-graph was prejudicial error. He mis-conceives his position as coming within the generally objectionable reference to "rogues gallery" photographs. That is not the case here. There was no indi-cation (except in counsel's brief) that the photograph came from the "files" of the Secret Service. The mention of photograph here was so innocuous that defendant's counsel almost missed it and

when it did come to his attention he simply asked that the reference be stricken, which it was. The case relied on by defendant, Lott v. United States, 218 F.2d 675 (5th Cir., 1955), cert. den. 351 U.S. 953, 76 S.Ct. 848, 100 L.Ed. 1477 (1956), reh. den. 352 U.S. 860, 77 S.Ct. 25, 1 L. Ed.2d 70 (1956), does not help him. In that case there was a reversal on other grounds and the Court of Appeals stated specifically that the reference to a police photograph was not in and of itself ground for reversal.

### (c) *Prejudicial question:*

 Another of the defendant's complaints is that the court erred in refusing to grant his motion to withdraw a juror when the prosecutor asked Wood, on redirect examination, what would have happened if defendants had found written memoranda on his person. The question, which was never answered, followed testimony by Wood that carrying written memoranda was an unsafe practice. Whether it was unsafe because discovery of such memoranda would reveal his identity and destroy his usefulness as an informant, or because it might expose him to violence, or both, was never clarified. Be that as it may, defendant cannot successfully complain about this redirect examination for it was he who opened up the subject. On cross-examination, defendant's counsel questioned Wood sharply and extensively about his failure to have memoranda of the various meetings and transactions. Wood was asked specifically why he destroyed his notes. The questioning implied that Wood had made but failed to keep memoranda so that there would be no writing to contradict his oral testimony. Surely defense counsel was aware that such an attack invited explanatory counter questions. He cannot now be heard to complain because the unuttered answer to one such question *might* have included fear of violence.

### (d) *Handling of exhibits not introduced:*

 In the course of the trial the assistant U. S. attorney, Mr. Prattis,

handled $20 notes at counsel table. This was called to the court's attention, at side bar, by defendant's counsel with a request that Mr. Prattis desist. The latter offered to introduce the notes to satisfy counsel's objection although he had not planned to do so. The court instructed the assistant U. S. attorney that he was not to handle the notes unless he intended to introduce them in evidence. Later in the trial, again at side bar, Mr. Prattis explained that the agents who had picked up the notes were not available and that he could not introduce the notes. He identified the notes as those which had been passed by Roberts. There ensued a discussion among counsel for all of the defendants, following which Feldman's counsel commented to the effect that it was all right "as long as the District Attorney doesn't use them and Your Honor instructs them". The court proceeded to do precisely what Feldman's counsel requested and instructed the jury to disregard the notes. There was no request for the withdrawal of a juror. There was nothing prejudicial in the incident.

### (e) *Refusal to examine Grand Jury testimony:*

 Feldman contends that it was error for the court to refuse his counsel's request to peruse Wood's Grand Jury testimony. This is a matter committed to the discretion of the trial judge where a "particularized need" has been shown. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), reh. den. 361 U.S. 855, 80 S.Ct. 42, 4 L.Ed.2d 94 (1959). In this case no "particularized need" was shown. It was apparent that counsel sought only, as he himself put it, the opportunity to see if there might be inconsistencies in Wood's testimony. This is not the particularized need to which the Supreme Court referred. The case of Gordan v. United States, 112 U.S. App.D.C. 33, 299 F.2d 117 (1962) relied on by defendant is inapposite. There the defendant was convicted on the *uncorroborated* testimony of a single witness

whose testimony was flatly contradicted by a witness for the defense. Here Wood's testimony was not uncorroborated. Numerous witnesses appeared, including several co-conspirators, special agents, custodians of telephone records, all corroborating Wood's testimony. Feldman called no witness to contradict Wood, the only contradiction coming from Feldman's own lips in the recitation of an explanation which the jury was not compelled to, and obviously did not, accept.

Defendant's motions are denied.