UNITED STATES of America

v.

Rudolph E. BOYANCE.

Cr. No. 20914.

United States District Court
E. D. Pennsylvania.

Sept. 15, 1966.

Drew J. T. O'Keefe, U. S. Atty., by Merna B. Marshall, Asst. U. S. Atty., for plaintiff.

David H. Kubert, Philadelphia, Pa., for defendant.

## OPINION AND ORDER SUR MOTION TO WITHDRAW GUILTY PLEA

LUONGO, District Judge.

On November 21, 1961, Rudolph E. Boyance and seven others [1] were indicted for conspiracy to violate the counterfeiting laws of the United States. In three other counts of the indictment Boyance was charged with possession and sale of counterfeit $20 Federal Reserve notes. On May 31, 1962, while represented by counsel, Boyance entered a plea of guilty to the four counts in which he was named and, on August 14, 1962, he was sentenced to a term of imprisonment of a year and a day on each count, the sentences to be concurrent and to commence at the expiration of a state sentence he was then serving. Three years later, on August 20, 1965, Boyance filed the motion now before me for decision, a motion under Criminal Rule 32(d) to withdraw the plea of guilty.

Two grounds are asserted for this motion; first, that the court failed to comply with the requirements of Criminal Rule 11 in that it did not make appropriate inquiry at the time of the plea before accepting it; and second, that the plea was not voluntary.

1. For discussion of evidence and post trial motions of certain of the defendants see United States v. Boyance, 215 F.Supp. 390 (E.D.Pa.1963); United States v.

Boyance, 329 F.2d 372 (3d Cir. 1964), cert. denied sub nom., Feldman v. United States, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964).

*Timeliness of the Motion.*

■ Preliminarily, a few comments concerning the timeliness of this motion. There is no time limit on a motion to withdraw a guilty plea under Rule 32 (d),[2] United States v. Washington, 341 F.2d 277, 281 (3d Cir.), cert. denied, De Gregory v. United States, 382 U.S. 850, 86 S.Ct. 96, 15 L.Ed.2d 89 (1965). If such motions are made before sentence is imposed they should be granted with great liberality, United States v. Roland, 318 F.2d 406, 409 (4th Cir. 1963), but if made after sentence defendant must show that withdrawal of the plea is necessary "to correct manifest injustice." See Sullivan v. United States, 348 U.S. 170, 174, 75 S.Ct. 182, 99 L.Ed. 210 (1954); Davenport v. United States, 122 U.S.App.D.C. 344, 353 F.2d 882, 885 (1965) (per curiam); United States v. Roland, supra. ("only in extraordinary cases"); Fed. Rules Crim. Procedure 32(d). The application is addressed to the sound discretion of the trial judge. Davenport v. United States, supra; United States v. Roland, supra; United States v. Shneer, 194 F.2d 598, 599 (3d Cir. 1952).

*Failure to Make Inquiry at Time of Plea.*

The first ground asserted by Boyance is that the court failed to comply with the requirements of Rule 11[3] before accepting his guilty plea and that failure, without more, entitles him to withdraw the plea and have the judgment of conviction set aside on a motion under Rule 32(d) or, if in federal custody at some later date, by a proceeding under 28 U.S. C.A. § 2255. If Boyance is correct in this contention he is entitled to the grant of his motion, for it is unquestioned that no inquiry was made at the time his guilty plea was accepted by the court.

There is disagreement among the circuits as to whether the at-time-of-plea failure to inquire of a criminal defendant or otherwise determine that a plea was made voluntarily and with understanding, is a fatal defect foreclosing inquiry as to understanding and volition, or whether the deficiency may be cured in some fashion.

That the court's failure to make inquiry at the time of plea vitiates the plea, requiring the setting aside of the judgment of conviction based thereon, appears to be the holding of the Court of Appeals for the Ninth Circuit in Heiden v. United States, 353 F.2d 53, at page 55 (1965). In holding the requirements of Rule 11 to be mandatory, the Court said:

" * * * the fact that a plea was intelligently entered *and that counsel was intelligently waived* must be ascertained at the time of arraignment or of waiver and not after the fact." (Emphasis supplied.)

The quoted language gives rise to some question that the ruling was limited to guilty pleas entered without counsel, but since the Court expressly overruled Long v. United States, 290 F.2d 606 (9th Cir. 1961) in which defendant had been repre-

---

2. "Rule 32. Sentence and Judgment
\* \* \* \* \*
(d) Withdrawal of Plea of Guilty. A motion to withdraw a plea of guilty or of *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea."

3. Rule 11, Federal Rules of Criminal Procedure, as it was in force at the time of plea stated:
"Rule 11. Pleas
A defendant may plead not guilty, guilty or, with the consent of the court, *nolo*

*contendere.* The court may refuse to accept a plea of guilty, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty."
The Rule has recently been amended. However, even the amended Rule, which requires the judge to *personally* inquire of the defendant, has no self-executing sanctions and resort still must be had to Rule 32(d) to correct "manifest injustice."

sented by counsel at the time of the entry of the plea, the Ninth Circuit must be said to subscribe to the view that the time-of-plea deficiency in the record cannot be cured, whether or not the defendant had been represented by counsel at the time of plea.

The contrary view has been followed in Hobbs v. United States, 340 F.2d 848 (7th Cir. 1965), cert. denied, 382 U.S. 908, 86 S.Ct. 245, 15 L.Ed.2d 160 (1965) where, notwithstanding a failure to comply with Rule 11 at the time of the entry of the plea, the Court found from evidence adduced at a hearing on the defendant's § 2255 motion and the transcript of the trial that the plea had been made voluntarily and with understanding; Johnson v. United States, 301 F.2d 631 (8th Cir. 1962) where there was no inquiry at time of plea, but the voluntary nature thereof and understanding were determined from the "transcript as a whole," from the fact that defendant was represented by counsel of his own choosing, and that defendant was knowledgeable in criminal matters; Domenica v. United States, 292 F.2d 483 (1st Cir. 1961) wherein the matter was remanded to the trial court for hearing to ascertain whether, notwithstanding non-compliance with Rule 11 at time of plea, the plea was in fact voluntary and, if so, the failure to comply was harmless error; and finally, Del Piano v. United States, 362 F.2d 931 (3d Cir. May 17, 1966) in which the Court of Appeals for this Circuit, in ruling that the movant's claim that his guilty plea had been induced by promises of the FBI could not be conclusively resolved from "the motion and the files and records of the case," remanded the matter to the trial court for an evidentiary hearing on the factual issues raised by the motion. By remanding for an evidentiary hearing, the Court impliedly ruled that failure to comply with the requirements of Rule 11 did not foreclose inquiry into the alleged promises and their effect upon the voluntariness of the plea.

■ I conclude, therefore, that the failure to make inquiry at the time of the entry of the guilty plea as required by Rule 11, does not, in and of itself, require the setting aside of the judgment of conviction based thereon.

*Merits of the Motion.*

Since the failure to inquire at time of plea does not constitute sufficient ground for setting aside the plea of guilty, it is necessary to consider whether Boyance should be permitted to withdraw the plea to "correct manifest injustice." Inquiry has been made into the circumstances leading up to, and surrounding the entry of the plea by an evidentiary hearing at which all witnesses requested by Boyance to be present were, by the court's direction, subpoenaed to, and did, appear and testify.

On the credible evidence adduced at the hearing; from a review of the transcript of the proceedings before the Grand Jury which have been examined at Boyance's request; and on other matters of court record of which I may take cognizance, I find the following

FACTS

1. On or about March 27, 1961, upon his release from Burlington County jail, Boyance was invited to participate in the handling and distribution of counterfeit money.

2. On or about March 27, 1961, Boyance communicated with FBI agent Noah Bass, for whom he had on earlier occasions acted as informant, to ascertain whether the latter would pay for information concerning counterfeit bills. Bass advised Boyance that such operations were within the jurisdiction of the Treasury Department rather than the FBI and offered to arrange a meeting for Boyance with Secret Service Agents of the Treasury Department. Boyance declined the offer and requested that his identity not be revealed to Secret Service Agents. The request was honored and Boyance's identity was not revealed to Secret Service Agents by Bass.

3. From approximately March 27, 1961, until at least sometime in June

1961, Boyance actively participated with others in planning and in attempting to obtain and distribute large quantities of counterfeit money. In the course of those efforts Boyance participated in the actual passing of some counterfeit $20 Federal Reserve notes in the Bucks County area.

4. In early April 1961, Secret Service Agents received information about certain counterfeiting activities from a Bucks County tavern operator who turned over to them a sample counterfeit $20 note which he had received from Boyance. From that time on Boyance was the Treasury Department's principal suspect in the investigation of the counterfeiting activities. Undercover agents were brought in for the purpose of surveilling and investigating the activities of Boyance and his co-conspirators.

5. In June 1961, after a trip to Newark, New Jersey with co-conspirators to obtain a large quantity of counterfeit notes proved unsuccessful, Boyance called Chief of Police Riempp of Bensalem Township seeking to sell information. As a result of the call Riempp arranged a meeting in his home between Boyance and Joseph P. Jordan, Special Agent in Charge, Philadelphia office, Secret Service, and Agent Kelly.

6. At the meeting in Riempp's home, Boyance attempted to make an arrangement with Agents Jordan and Kelly to furnish information to them concerning the counterfeiting activities and to perform services for the Treasury Department in apprehending the participants, but the offer was rejected by the agents

inasmuch as Boyance was himself their principal suspect in such activities.

7. In September 1961, while in Montgomery County jail awaiting trial on unrelated state criminal charges, Boyance, at his own request, was interviewed by Secret Service Special Agent James T. Burke who, after advising Boyance of his constitutional rights, informed him that the government was preparing a case to seek a conspiracy indictment against several persons, Boyance included. In that interview Boyance exhibited a willingness to testify for the government against all the participants in the conspiracy except Bescoe, his brother-in-law, and Kiefaber, who was taking care of Boyance's family while he was in jail. Boyance advised Burke that he had pending a prosecution in Bucks County, and expressed a preference to serve a federal, rather than a state sentence. Burke made no promises of any kind to Boyance at that interview or at any other time.

8. Later in September 1961, Boyance was tried in Bucks County on charges of burglary, larceny, receiving stolen goods, etc. (See U. S. ex rel. Boyance v. Myers, U.S. District Court, M-2728.)

9. On November 21, 1961, Boyance testified before a Grand Jury of this court. After being sworn Boyance was advised of his right to counsel, the right to remain silent and was specifically warned that the Grand Jury might indict him.[4] Boyance's testimony before the Grand Jury leaves no doubt that Boyance was criminally, rather than innocently involved in the counterfeiting activities.[5]

4. Contrary to the testimony Boyance gave at the hearing on this motion. The pertinent part of the Grand Jury transcript reveals, at page 40:

"BY MR. DePAUL:

Q Mr. Boyance, I first want to advise you that as you may become a defendant in this particular case it is not necessary that you testify, nor need you testify, and that anything you say is going to be taken down stenographically and may well be used against you, and that the Grand Jury may well present charges against you. Do you understand that?

A Yes, I do.

Q Also, further that before you testify that you can have counsel if you desire?

A I waive counsel.

Q You choose to voluntarily testify at this time?

A Yes, I do."

5. Toward the end of his testimony he did state that he was acting with knowledge of the FBI, but immediately thereafter admitted that he had not been given instructions to act.

10. Prior to testifying before the Grand Jury, Boyance met with Assistant United States Attorneys Creamer and De-Paul and Secret Service Agent Kelly and indicated a desire to testify and to co-operate with the government. Boyance was informed either by Creamer or by DePaul that in the event he would there-after cooperate with the government, the extent of his cooperation would be made known to the sentencing judge. Boyance was at that time awaiting sentence by the Bucks County Court on the charges mentioned in Finding No. 8 above and ex-pressed his concern that he wanted to be sentenced on federal charges first.

11. At the time of his appearance be-fore the Grand Jury Boyance had not cooperated in any manner with repre-sentatives of the government with respect to counterfeiting activities. Boyance had no reason to believe that government agents were under the impression that he had cooperated.

12. On December 15, 1961, Boyance appeared before this court for arraign-ment, waived counsel for purposes of ar-raignment only and entered a plea of "Not Guilty" to the four counts in which he was charged.

13. On December 18, 1961, Boyance was sentenced by the Bucks County Court to concurrent terms of 5 to 10 years im-prisonment on each of six bills. At the time of sentencing no representative of any agency of the United States appeared before the Bucks County Court to make any statement in Boyance's behalf.

14. On May 4, 1962, James J. Phelan, Jr., Esquire, formerly an Assistant Unit-ed States Attorney in this district, enter-ed his appearance for Boyance. Phelan had theretofore entered his appearance for Edwin Bescoe, Boyance's brother-in-law.

15. Between the time he was retained as counsel and the date of trial, Phelan had the opportunity to, and did, consult with Boyance concerning the charges against him. At no time did Boyance in-dicate to Phelan that he had acted the role of an undercover agent or that he had acted at the behest of, or on instructions from, any agent or agency of the United States.

16. (a) The criminal case was called for trial on May 31, 1962. Boyance did not ask Phelan to seek a continuance of the trial to enable Boyance to engage other counsel.

(b) During the voir dire of the jury Boyance informed Phelan that he wished to change his plea to "guilty" and asked Phelan to make known to Assistant Unit-ed States Attorney Prattis, who was to prosecute the case, his willingness to testify against his co-conspirators upon condition that at the time of sentencing the court would be apprised of his co-operation.

(c) Phelan concurred in Boyance's de-cision to enter a plea of guilty, notified Assistant United States Attorney Prattis of the decision and advised him of Boy-ance's willingness to testify upon condi-tion that at sentencing the court would be apprised of the cooperation.

(d) Prattis was non-committal as to his intention to use Boyance as a witness and expressly reserved decision pending developments during the trial. Prattis made no representations or promises to Phelan which induced or persuaded Boy-ance to enter a guilty plea.

17. By personal observation of Boy-ance and from familiarity with numerous documents, pleadings, correspondence and memoranda of law filed *pro se* by Boy-ance in this proceeding as well as in United States ex rel. Boyance v. Myers, D.C., 219 F.Supp. 12, Misc. No. 2543; United States ex rel. Boyance v. Myers, Misc. No. 2728; United States ex rel. Boyance v. Myers, Misc. No. 3008; and Boyance v. United States, Civil Action No. 34641, the court finds as a fact that Boyance is now, and at all times from and after the institution of these criminal proceedings was, an intelligent and artic-ulate person. The court finds further that Boyance had extensive experience in crime and was familiar with criminal courts and criminal procedure. As of 1962 he had been involved in at least 16 criminal charges of varying degrees of seriousness, covering a period of 15

years, resulting in at least 10 convictions with several jail sentences.[6]

18. On May 31, 1962, when he entered the plea of guilty to these charges, Boyance understood the implications and consequences of the plea, was aware of the defenses which might have been raised to the charges, and his entry of the plea of guilty upon the advice and with the concurrence of his experienced counsel was intelligent and understanding.

19. Boyance's plea of guilty was not induced by any promises made to him or to his attorney by Assistant United States Attorney Prattis or by any other representative of the government. In accordance with the usual procedure of

the United States Attorney's office, Boyance's attorney was advised that to the extent that Boyance would cooperate, the sentencing court would be apprised of it at time of sentencing.

20. Assistant United States Attorney Prattis did not call Boyance as a witness at the trial because he concluded that he had no need for Boyance's testimony and because, from a comparison of Boyance's Grand Jury testimony with the testimony of other witnesses and reports of government agents, Prattis was convinced that Boyance had not been completely truthful in his testimony before the Grand Jury in that he had made exculpatory statements designed to minimize his role in

---

6. According to the records of the FBI as listed in Boyance's Presentence Report, Boyance's prior criminal record under FBI No. 491 3374 was:

| | | | |
|---|---|---|---|
| | 7/21/47 | Indianapolis, Ind. | Violation of the Indiana False Hotel Registration Law. Dismissed. |
| * | 7/28/47 | Chicago, Ill. | Larceny by bailee and tampering with auto. Six months probation. |
| | 4/2/48 | Detroit, Mich. | Uttering and publishing. Discharged. |
| * | 6/10/48 | Cedar Rapids, Iowa | Embezzling mortgaged property. Restitution. |
| * | 8/13/54 | Cincinnati, Ohio | Larceny by trick. Fined. |
| | 7/21/55 | Bristol, Penna. | Uttering a worthless check. Discharged. |
| | 5/9/56 | Fallsington, Penna. | Obtaining money under false pretenses. Not guilty. |
| * | 9/26/56 | Trenton, N. J. | False pretenses. Suspended sentence and costs. |
| * | 9/21/57 | Fallsington, Penna. | Issuing worthless checks. Costs of court and 21 days. |
| * | 12/24/57 | Mount Holly, N. J. | Defraud, issuing worthless checks. Suspended sentence and two years probation. |
| * | 5/16/60 | Trenton, N. J. | Soliciting without permit. Fined. |
| * | 9/12/60 | Cornwells Heights, Pa. | Burglary, forgery, and conspiracy. Forgery and conspiracy charge dismissed. 6 to 23 months on the burglary charge concurrent with the sentence for the offense of January 21, 1961. |
| * | 1/21/61 | Cornwells Heights, Pa. | Drawing and uttering a forged instrument. Costs plus 6 to 23 months as of September 23, 1960. Paroled on March 17, 1961. |
| | 3/22/61 | Mount Holly, N. J. | Conspiracy and uttering bank checks. Dismissed. |
| | 5/26/61 | Doylestown, Penna. | Contempt of Court. Dismissed. |
| * | 7/13/61 | Cornwells Heights, Pa. | Burglary and possessing burglary tools. Costs and 5 to 10 years. |

* Represent convictions.

the conspiracy. Prattis believed that Boyance had not theretofore cooperated and would not thereafter cooperate with the government in the prosecution of the case.

21. On August 14, 1962, Boyance and Bescoe appeared before the court for sentence, the court having in the meantime been furnished with Presentence Reports on each by the Probation Department. The Boyance Presentence Report contained, inter alia, the following:

"DEFENDANT'S STATEMENT: In an interview with the Probation Officer the defendant stated that he was actually working for the Federal Bureau of Investigation on some stolen bonds and learned of the counterfeit $20 notes. He stated that he had co-operated with the Secret Service in apprehending the other defendants, but he was never actually involved. In a further statement he said that Keifaber had left two counterfeit bills with him and asked him to find a buyer. He had called the Federal Bureau of Investigation who in turn called the Secret Service who told him that he did not have enough information. Two months later, after finding that Feldman was the dealer in the counterfeit bills, he had notified the Chief of Police in his community who in turn allegedly notified the county detectives. He stated that he had taken Thomas Redd into his home, but ordered him to move out when Redd became involved in burglaries. The Chief of Police then had him move back in and then later arrested him as the leader of the burglary ring. The sentence he is presently serving is a result of this conviction.

"In an effort to seek [sic, considered by the court as "check"] the validity of the subject's statements, both the Federal Bureau of Investigation and the Secret Service were called. According to the Federal Bureau of Investigation, Boyance did some work for them but no more recently than September, 1960. He was not in any way involved with their service at this time. He did call the Federal Bureau of Investigation who in turn communicated with the Secret Service but Boyance wanted nothing to do with the latter agency. According to the Secret Service, the subject did call the Chief of Police in Bensalem, but only after the offenses were committed did he sell him the information. Up until that time he had worked diligently to obtain the counterfeit notes and to commit the offense."

22. The statements made by the FBI and the Secret Service to the Probation Department accurately reflected Boyance's role.

23. Prior to the imposition of sentence Boyance's counsel stated, in part, in his behalf:

"Of course, I am—I am sure the Court is familiar with this, that he is married for quite a number of years and his wife is here in Court. He is the father of eight children, and I would like to bring to the Court's attention that Mr. Boyance, as Your Honor knows, pled guilty and cooperated with the Secret Service and the United States Attorney's office."

United States Attorney Prattis did not refute that statement and, by his silence, seemingly assented to it. At the time of pronouncing sentence the Court had been apprised of the nature and extent of Boyance's cooperation with the FBI and the Secret Service, and by Phelan's statement at the bar of the court, unrefuted by Prattis, the Court had been led to believe that Boyance had cooperated with the United States Attorney's office during the trial when in fact he had not.

24. Before sentence was pronounced Boyance acknowledged his guilt and expressed contrition in his response to the Court's question. (N.T. 6)

"THE COURT: Have you anything to say, Mr. Boyance, before sentence is pronounced?

"THE DEFENDANT BOYANCE: No, sir.

I am sorry it happened, Judge. That is all I can say."

25. After sentence was pronounced, Boyance did not pound the podium or otherwise demonstrate displeasure or disappointment as he testified he had done at the hearing on this motion. The Court's statement, after calling Bescoe for sentence, "Take Mr. Boyance away, please" (N.T. 7) was made to inform the United States Marshal that the Court had concluded Boyance's sentencing. The instruction was not given to terminate a demonstration.

26. On December 5, 1963, in Civil Action No. 34641 filed in this court, Boyance attempted to set aside the sentence under 28 U.S.C.A. § 2255 [7] and for the first time contended that the guilty plea entered by him on May 31, 1962, was not voluntary in that he had been advised by his counsel he would not be incarcerated; that the plea was coerced by the trial judge's refusal to grant a continuance to enable him to obtain other counsel because of a conflict of interest; and the plea was induced by a promise of the United States Attorney to present favorable facts to the trial judge.

## CONCLUSIONS

■ 1. The guilty plea entered by Boyance on May 31, 1962, with the advice and approval of his counsel was intelligently and understandingly made.

2. The guilty plea entered by Boyance on May 31, 1962, with the advice and approval of his counsel was voluntary.

3. There is no injustice surrounding the entry of this guilty plea, and there is, therefore, no basis for the grant of a motion to withdraw the plea of guilty.

## DISCUSSION

From the foregoing findings it is apparent that Boyance is, and was, an intelligent and articulate person, experienced and sophisticated in matters of crime and in criminal courts and procedure. See Verdon v. United States, 296 F.2d 549, 553 (8th Cir. 1961), cert. denied, 370 U. S. 945, 82 S.Ct. 1590, 8 L.Ed.2d 811 (1962). Unquestionably the plea entered by him with the advice and consent of experienced counsel of his own choosing was intelligently and understandingly made. It is no wonder that at the hearing on this motion Boyance did not press the allegation, made in his written motion, that he did not understand the consequences of the guilty plea.

Boyance's real contention is that his plea was induced by promises made to him or to his counsel and was, therefore, involuntary. His claim is that his role in these counterfeiting activities was that of undercover agent and that he was promised that the court would be apprised of that role at the time of sentencing. The charge is actually predicated on two sets of alleged promises: (a) those made prior to his appearance before the Grand Jury in November 1961, and (b) those made at the time of the change of plea on May 31, 1962.

The first set of alleged promises (prior to Grand Jury appearance) requires little discussion. It is apparent that Boyance did not rely on such alleged promises for, after the indictments were returned, he pleaded not guilty, retained counsel, discussed the charges with his counsel and made preparations to go to trial. In fact Boyance and his counsel did go to trial, and it was not until the jury selection process had actually commenced that Boyance informed counsel of his intention to enter a guilty plea. Such promises or representations as might have been made to Boyance in November 1961 clearly had no effect upon his decision to change his plea to guilty six months later.[8] More

---

7. That action was dismissed since Boyance was not then in Federal custody.

8. It should be noted in passing that one of the promises alleged to have been made prior to his Grand Jury testimony was that his cooperation would be brought to the attention of the sentencing judge on

the state charges in Bucks County. In December 1961, shortly after his appearance before the Grand Jury, Boyance was sentenced by the Bucks County judge to imprisonment for a term of 5 to 10 years. No representative of the United States appeared or made any statement on Boyance's behalf. This apparent failure to

important, the cooperation referred to in Boyance's discussion with Assistant United States Attorneys Creamer and DePaul was future cooperation and not, as Boyance is now claiming, past cooperation. All that Boyance did thereafter was to testify before the Grand Jury as to matters he had reason to believe the government agents already knew, at the same time attempting to put himself in the best light possible.

As for the second set of alleged promises, those made at the time Boyance changed his plea to guilty, it is again clear to me that the assurances that Boyance's counsel sought from Assistant United States Attorney Prattis had to do with Boyance's offer to testify against his co-conspirators. So far as Phelan knew, Boyance's only "cooperation" up to that point was that he had given a statement (unsigned) to the agents admitting his complicity. Phelan had not been told by Boyance about the alleged undercover role for the government,[9] consequently Phelan could not have been referring to that when he spoke of "cooperation." Of course, if Phelan had been told of the undercover role, I cannot conceive of his counselling Boyance to enter the guilty plea, nor can I conceive that he and the prosecuting attorney would undertake to bring to the court's attention facts clearly revealing absence of criminal intent and asking the court to impose sentence based on such facts. To the contrary, I am satisfied that what Phelan discussed with Prattis was Boyance's offer to testify against his co-defendants, an offer that was never accepted, in part at least, because the Assistant United States Attorney was convinced that Boyance had not been completely truthful.

Notwithstanding that Boyance's offer to testify was never accepted, a statement was nevertheless made to the court at time of sentencing that Boyance had, in fact, cooperated with the agents and with the United States Attorney's office. The statement was made by Boyance's counsel, and because the Assistant United States Attorney did not challenge or refute it in any way, he appeared to have acquiesced in the statement. To that extent the court was misled, because as it developed at the hearing on this motion, Prattis felt that Boyance had not cooperated at all. If anything, Prattis' failure to speak under these circumstances helped Boyance.

The inquiry on this motion is whether such manifest injustice surrounds Boyance's guilty plea that he should now, long after sentence, be permitted to withdraw it. Nothing in this record reveals any injustice, certainly not manifest injustice, in requiring the guilty plea to stand. In this regard I am mindful of Boyance's statement at the time of sentencing. As I have already pointed out, he is intelligent and articulate. Beyond that he is voluble, and not at all bashful. If the facts had been as Boyance now alleges them to have been, it is inconceivable that he would not have protested. I do not believe for a moment that if Boyance had been under the impression that some special role was to be brought to the court's attention that he would have contented himself with the statement, when asked if he had anything to say before sen-

---

live up to an alleged promise makes Boyance's testimony that he relied upon promises made to him by government representatives thereafter all the more incredible.

9. Boyance's own testimony at the hearing on this motion as well as his testimony before the Grand Jury makes it abundantly clear that after an initial unsuccessful attempt to sell information about it to FBI Agent Bass, Boyance became actively and criminally involved in the counterfeiting activities for a period of several months before he offered to cooperate with Secret Service Agents for the price of special treatment for himself and two of the co-conspirators. What occurred during that attempt, even according to Boyance's testimony, afforded him no basis for believing that he was entitled to, or would receive, special consideration.

tencing, "No, sir. I am sorry it happened, Judge. That is all I can say." His explanation, offered at the hearing on this motion, that his failure to speak after sentence [10] was pronounced was due to shock is just as unbelievable. Boyance claims now that he started to pound on the podium after the imposition of sentence to register his protest, but was ordered removed from the courtroom before he could say anything. Of course it didn't happen. If such a demonstration had occurred, it would have been duly noted on the record and dealt with promptly. As is this court's practice after imposing a sentence of imprisonment, the United States Marshal was instructed to remove the defendant from the courtroom when the sentencing had been concluded. Boyance has seized upon that instruction and has attempted, by patently false testimony, to convert it into something entirely different. His attempt has served only to confirm the unreliability of his testimony and his genius for distorting facts to further his own interests.

Boyance has not satisfied me that his guilty plea was anything other than intelligent, understanding and voluntary. Cf. Shelton v. United States, 246 F.2d 571 (5th Cir. 1957), rev'd on confession of error, 356 U.S. 26, 78 S.Ct. 563, 2 L. Ed.2d 579 (1958); Scott v. United States, 349 F.2d 641 (6th Cir. 1965); United States v. Shneer, 194 F.2d 598 (3d Cir. 1952), on remand, 105 F.Supp. 883 (E.D.Pa.1952); United States v. Lias, 173 F.2d 685 (4th Cir. 1949). There is no element of unfairness or injustice connected with the plea, only disappointment with the sentence.

Since there is no manifest injustice in allowing the guilty plea to stand, the motion for leave to withdraw it will be denied.

10. The sentence was a year and a day concurrent on each of the four counts. The maximum sentence on the conspiracy count (18 U.S.C.A. § 371) is $10,000 and/or 5 years; on each of the two counts charging uttering counterfeit money (18 U.S.C.A. § 472) is $5,000 and/or 15 years; and on the count charging dealing in counterfeit money (18 U.S.C.A. § 473) is $5,000 and/or 10 years.